IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIMEGATE STUDIOS, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:09-CV-3958 |
| | § | |
| | § | |
| SOUTHPEAK INTERACTIVE CORP., | § | JURY DEMANDED |
| SOUTHPEAK INTERACTIVE, LLC, | § | |
| GONE OFF DEEP, LLC d/b/a GAMECOCK | § | |
| MEDIA GROUP and TERRY M. PHILLIPS, | § | |
| | § | |
| *Defendants* | § | |

## SECOND AMENDED COMPLAINT
## AND REQUEST FOR A CONSTRUCTIVE TRUST

**NOW COMES** Plaintiff TimeGate Studios, Inc. and files this, its Second
Amended Complaint and Request for a Constructive Trust  against Defendants
SouthPeak Interactive Corporation, SouthPeak Interactive, LLC, Gone Off Deep,
LLC d/b/a Gamecock Media Group and Terry M. Phillips, and shows the Court as
follows:

## I. PARTIES

1.      Plaintiff TimeGate Studios, Inc. ("TimeGate") is a Texas corporation
with its principal place of business located at 14140 Southwest Freeway, Suite 200,
Sugar Land, Texas 77478.

2.      Defendants SouthPeak Interactive Corporation and SouthPeak
Interactive, LLC (collectively "SouthPeak") are Delaware corporations with their

principal place of business located at 2900 Polo Parkway, Suite 104, Midlothian, Virginia 23113.

3.     Defendant Gone Off Deep, LLC d/b/a Gamecock Media Group ("Gamecock") is a Delaware Corporation with its principal place of business in Texas.

4.     Defendant Terry M. Phillips ("Phillips"), is the chairman of SouthPeak Interactive Corporation.  He is a resident of Virginia and can be served at his business address, 2900 Polo Parkway, Suite 104, Midlothian, Virginia 23113.

## II. JURISDICTION AND VENUE

5.     Jurisdiction over the parties and subject matter of this action is proper pursuant to 15 U.S.C. § 1121 (actions arising under the Lanham Act), 28 U.S.C. § 1331 (actions arising under the laws of the United States), 28 U.S.C. § 1332(a) (diversity of citizenship between the parties with an amount in controversy greater than $75,000), and § 1338(a) (actions arising under an Act of Congress relating to copyrights and trademarks). The Court has supplemental jurisdiction over the claims that arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a).  Defendants are subject to personal jurisdiction because they do business in the State of Texas.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because a substantial part of the events giving rise to the claims in this action occurred within this district.  Specifically, Section 8 ("Section 8" or "the Game"), TimeGate's highly intense, interactive video war game,

was developed in this District, its distribution originated from this District, and the trademarks and copyright which TimeGate has obtained and retains for Section 8 were acquired in this District.

## III. FACTUAL BACKGROUND

### A.    TIMEGATE RISES TO THE TOP OF THE GAMING INDUSTRY.

7.    Founded in 1998 in Sugar Land, TimeGate employs 71 people in the Houston Metropolitan area.   TimeGate is a leading developer of video game software for PCs and game consoles, including Microsoft's Xbox 360.   TimeGate has created highly popular video games as exemplified by its immediate success with its first game, KOHAN: IMMORTAL SOVEREIGNS, which included a sweep of the Strategy Game of the Year awards from *Computer Gaming, PC Gamer* and *Computer Games Magazine*.   TimeGate's second release, KOHAN II: KINGS OF WAR, was included as one of the Top 10 games of 2004 by *Computer Games Magazine*.

8.    In late 2004, TimeGate and Atari released AXIS & ALLIES, a real-time strategy game that let players battle against World War II superpowers.   In 2006, TimeGate introduced the gaming industry to F.E.A.R. EXTRACTION POINT, which was named "Best Expansion Pack of 2006" *by PC Gamer*.   In conjunction with the aforementioned titles, TimeGate has also announced other next-generation, cross-platform projects in various development stages, all of which have contributed to its success as a well-known developer within the gaming industry.

**B. TimeGate Invests Millions to Develop Section 8 and Hires Gamecock to Publish the Game**

9.      In 2005, TimeGate began developing Section 8.   TimeGate spent millions of dollars to develop the Game, which was released on September 1, 2009. Each of TimeGate's 71 employees was involved in the development process. TimeGate invested millions of dollars and devoted most of its resources from 2005 through the fall of 2009 to Section 8.   However, TimeGate currently is not receiving any revenue from sales of the Game.

10.     In the video game industry, software developers typically partner with independent publishing companies to package, distribute, and sell their games to retailers.   TimeGate considered several candidates to act as the publisher for Section 8.

11.     On or about June 15, 2007, TimeGate entered into a publishing agreement (the "Publishing Agreement") with Gamecock, a Texas-based company. The Publishing Agreement provided Gamecock with the right to reproduce, manufacture, package, advertise, publish, market and sell the Game on Microsoft's Xbox 360 gaming console and the PC. Gamecock was provided with only a limited right of first refusal as to the SonyPlayStation 3 ("PS3").   *See* Exhibit "A", a true and correct copy of the Publishing Agreement.

12.     Pursuant to the Publishing Agreement, TimeGate was to receive a series of milestone payments for work performed on Section 8 during the course of development, followed by royalty payments for sales of Section 8.

13.    The Publishing Agreement required Gamecock to distribute a percentage of the net revenues from sales of Section 8 to TimeGate as royalty 45 days after the close of every quarter.

14.    Pursuant to Section 7.1 of the Publishing Agreement, Gamecock was to furnish a royalty report for each calendar quarter which provided specific information regarding the number of copies sold, gross revenues, deductions and offsets, which included Costs of Goods sold, "COGS", as defined in Section 1.6 of the Publishing Agreement.

15.    Royalty payments were to be made in accordance with Section 6.2 of the Publishing Agreement, entitled "Distribution of Net Revenue".  Net Revenue was defined in Section 1.29 as "…Gross Revenues pertaining to such Revenue Stream, less the Costs of Goods Sold *for such Game Units*…".

16.    As such, Net Revenue was to be distributed between the parties after the COGS were recouped on a per box basis.  COGS, however, only pertained to those copies of Section 8 that were actually sold, not the total number that were actually manufactured.

17.    In calculating net revenue, only specific expenses such as shipping, taxes, distribution fees, and sales commissions related to actual "products sold" pursuant to the terms of the Agreement may be deducted.

18.    TimeGate was provided with the right to audit Gamecock's books and records under Section 7.3 of the Publishing Agreement in order to verify data

concerning gross and net revenues, as well as sales and promotional distributions of game units.

19.     Under § 9.1 of the Publishing Agreement, TimeGate retained exclusive ownership of the intellectual property rights to Section 8.  Before the Game was released, TimeGate obtained two federally registered trademarks for Section 8.  See Exhibits "B" and "C", true and correct copies of the trademarks, respectively. TimeGate has also received one federally registered copyright for Section 8.   See Exhibit "D" a true and correct copy of the copyright.

20.     While Gamecock was granted a license for purposes of selling, promoting and distributing the Game, the Publishing Agreement states that Gamecock may not transfer, sell, assign, sublicense or otherwise convey and portion of the Section 8 deliverables to any other party except as authorized by TimeGate.

21.     Under the Publishing Agreement, Gamecock was required to obtain TimeGate's prior written approval before developing or selling Section 8 memorabilia such as tee shirts, posters, key chains, cups, Frisbees, or clothing.

22.     Section 18.1 (d)(B), provided TimeGate, in its sole discretion, the unconditional right to terminate the Agreement in the event Gamecock became insolvent or in the event certain other conditions occurred.

**C.     GAMECOCK'S INSOLVENCY AND SOUTHPEAK'S EXPLOITATIONS**

23.     On October 10, 2008, Gamecock was acquired by SouthPeak, another video game publisher.

24.     SouthPeak purported to maintain Gamecock as a separate corporate entity. However, without informing TimeGate, SouthPeak stripped Gamecock of its assets and resources, effectively dissolved the corporation, and began exploiting Section 8 for its own advantage.

25.     After the acquisition, SouthPeak's CEO, Terry M. Phillips, executed a self-serving "agreement" between SouthPeak and Gamecock, assigning SouthPeak complete control over all Gamecock-published games.  See Exhibit "E", a true and correct copy of the Distribution "Agreement" between SouthPeak and Gamecock.

26.     Far from being arms length, this so-called "agreement" was pure windfall for SouthPeak.  Indeed, SouthPeak prepared the "agreement" without any negotiation, and Phillips executed it on behalf of both SouthPeak and Gamecock.

27.     The "agreement" stated that, at the time of the acquisition, "Gamecock's liabilities substantially exceed the value of its assets and Gamecock did not possess the working capital required to continue to operate its business."

28.     The "agreement" gave SouthPeak control over all Gamecock-published video games, including Section 8, and transferred the right to sell and collect revenues from Gamecock-published games from Gamecock to SouthPeak.

29.     The "agreement" also gave SouthPeak the right to retain 25 percent of all sales revenues from Gamecock-published video games as a "distribution fee" and also gave SouthPeak the right to reimbursement for *any* costs or expenses related to game publishing on top of their 25 percent fee.

30.     SouthPeak concealed this "agreement" from TimeGate.   SouthPeak misrepresented GameCock's true financial condition to TimeGate to avoid losing Section 8 revenues, as Gamecock's insolvency was grounds for termination of the Publishing Agreement, and the Publishing Agreement prohibited the purported assignment of rights that SouthPeak orchestrated and concealed.

31.     Following the acquisition, Phillips and SouthPeak's president, Melanie Mroz, repeatedly and falsely assured Timegate's CEO, Adel Chaveleh, that Gamecock was able, and would continue, to perform its obligations to TimeGate under the Publishing Agreement, and that Gamecock was a functioning business entity.

32.     Between January 6, 2009 and October 29, 2009, Phillips and Mroz executed a series of four amendments to the Publishing Agreement, purportedly on behalf of Gamecock.

33.     Phillips and Mroz assured Chaveleh that Gamecock's status as a "subsidiary" of SouthPeak would not hinder its ability to perform its obligations to TimeGate.

34.     In reality, Phillips and Mroz knew that SouthPeak had stripped Gamecock of all assets and financial resources and that SouthPeak had no intention of allowing Gamecock to perform its obligations to TimeGate.

35.     Phillips and Mroz knew that they had entered into a self-serving deal designed to give SouthPeak, rather than Gamecock, control over Section 8 and the sales revenue that the Game generated.  In fact, SouthPeak has entered Gamecock's

books and records into its own accounting system in Midlothian, Virginia, where, upon information and belief, they appear to have been manipulated by SouthPeak in order to reduce Gamecock's royalty obligations.

**D.    SOUTHPEAK USES DECEPTIVE PRACTICES TO PREVENT TIMEGATE FROM RECEIVING ROYALTIES ON SECTION 8**

36.    After Section 8 launched, TimeGate learned that SouthPeak had used a variety of deceptive practices to conceal revenues from Section 8 and exploit the game for its own advantage.   For example, SouthPeak registered several domain names related to Section 8, including, but not limited to, <joinsection8.de>, <joinsection8.net>, <joinsection8.info> and <S8-gate.com> without TimeGate's knowledge.

37.    Just before the release of Section 8, SouthPeak encouraged the world's largest online retailer of video games, Steam, to bundle Section 8 with a downmarket SouthPeak game called "Raven Squad."

38.    Without TimeGate'sknowledge, SouthPeak caused Steam to offer a "two for one" discount to customers who bought both products together.

39.    This inflated total sales revenues from SouthPeak's Raven Squad game while diminishing revenues from Section 8.   TimeGate had no knowledge of this arrangement, as it was concealed.

40.    Before Section 8's launch, SouthPeak also collected a $250,000 lump sum payment from 1C, a Russian video game retailer for the right to distribute the Game in Russia.

41.     The agreement with 1C included a license to sell PS3 versions of the game, although the Publishing Agreement specifically denies that right to Gamecock.

42.     The contract with 1C was cancelled, but SouthPeak retained the $250,000 payment.

43.     To avoid sharing this lump sum payment with TimeGate, SouthPeak retroactively re-classified the payment as a cancellation fee rather than a payment for Section 8 distribution rights.

44.     SouthPeak concealed the 1C contract—and the $250,000 payment – from TimeGate.

45.     Furthermore, SouthPeak has engaged in other self-dealing non-arms length transactions involving Section 8 without telling TimeGate.

46.     For example, SouthPeak has entered into several other contracts with other entities controlled by Phillips that give these entities the right to collect various "distribution fees" from Section 8 revenues.

47.     SouthPeak concealed these activities from TimeGate.

**E.     TIMEGATE DISCOVERS SOUTHPEAK HAS FALSIFIED REVENUE AND COST INFORMATION FOR SECTION 8.**

48.     Although Gamecock's royalty report for the third quarter of 2009 was due to TimeGate on November 15, 2009, Gamecock missed this deadline.

49.     When Gamecock finally submitted a royalty report, it appeared that SouthPeak, rather than Gamecock, had generated the report and the figures it contained.

50.     The report indicated that Gamecock had collected an average of $13.00 for each game it sold while incurring costs of almost $100 per unit.

51.     TimeGate was suspicious of these numbers and requested to exercise its contractual audit rights of Gamecock's books and records.

52.     Moreover, TimeGate was informed that it would not be receiving any royalty payments for first quarter sales because Gamecock had not received any revenue from the sales of the Game.

53.     TimeGate was told that the Publishing Agreement between TimeGate and Gamecock dictated that TimeGate was not due any royalty payments because the total amount expended by Gamecock for *all* copies of Section 8 had not been recouped, despite the fact the acronym for "COGS" stands for Cost of Goods *Sold* only.

54.     Thereafter, on December 10, 2009, TimeGate unilaterally terminated the Publishing Agreement with Gamecock due to its insolvency and various contract breaches.

55.     Subsequently, TimeGate hired Timothy Christian, the founder of TC Associates, to conduct the audit and determine the amounts owed to it.   TC Associates is a highly-esteemed accounting firm in London specializing in royalty audits for the video game industry.

56.     On January 6-8, 2010, Christian, on behalf of TimeGate, inspected Gamecock's books for the first quarter of sales for Section 8 at SouthPeak's

headquarters.  Although TimeGate had been promised sales data for all quarters to review, only data pertaining to the first quarter was provided.

57.     Despite the auditor being provided with a "revised" royalty report on January 6, 2010, the revised report did not recognize any royalty obligation to TimeGate and contained false information.

58.     During Christian's visit, defense counsel repeatedly flip-flopped on promises to provide information necessary for a proper, full and informative audit. They refused to provide contracts with retailers needed to verify the accuracy of the information contained in invoices.

59.     Nonetheless, Christian confirmed sales had not been properly reported, revenue was understated and that other discrepancies existed as to the true cost to publish Section 8.    Based on the data provided, Christian found that Gamecock owes TimeGate $301,940.00 in royalties for sales of the game from the first quarter of 2009 alone.  See Exhibit "F", a true and correct copy of the audit report.

60.     TimeGate anticipates that Gamecock's royalty obligations for October, November and December 2009, and January 2010 will be significantly higher, once information concerning Section 8 for the sales for these months is produced in discovery.

**F.     SOUTHPEAK'S CONTINUED FINANCIAL VIABILITY IS IN QUESTION.**

61.     SouthPeak's solvency and ability to pay TimeGate damages for its various infringements, as well as for royalties owed by Gamecock , is in doubt.

62.   On August 26, 2009, the Securities and Exchange Commission ("SEC") announced its investigation of SouthPeak for publishing potentially false information in its financial statements, specifically, regarding certain matters underlying the amendment of its Form 10-Q for the period ended March 31, 2009 and the termination of its former chief financial officer.

63.   SouthPeak's Chairman of the Board, Defendant Terry M. Phillips, had previously been the subject of a Securities and Exchange Commission investigation, administrative proceeding and lawsuit in which his previous company was charged with aiding and abetting another video game company, with Phillips determined to be the "controlling person". Without admitting or denying liability, Phillips later entered into a monetary settlement and was ordered to cease and desist from committing future violations.

64.   SouthPeak had also been a named defendant in numerous lawsuits stemming from the non-payment of Gamecock's vendors after the acquisition. In November of 2009, the plaintiff in *CDV Software Entertainment v. SouthPeak Interactive, LLC et al.* (U.K.), obtained a $4.5 million judgment against SouthPeak.

65.   Subsequently, TimeGate has reiterated to SouthPeak that it has no intellectual property rights to Section 8.  TimeGate has demanded the return of its intellectual property and for it to be compensated for SouthPeak's various acts of infringement.

66.   At the time of this filing, SouthPeak had not returned all copies of the Game to TimeGate as requested, was still selling, distributing and marketing

Section 8 and Section 8 memorabilia, and had not transferred the Section 8-related domain names to TimeGate.

## IV. <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>

### BREACH OF CONTRACT AGAINST GAMECOCK

67.     TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

68.     TimeGate entered into the Publishing Agreement with Gamecock on June 15, 2007.  The Publishing Agreement was valid and enforceable.

69.    TimeGate tendered performance in accordance with its obligations and performed all conditions precedent as required by contract and law.

70.     Gamecock, however, did not comply with its contractual obligations in that it has failed to provide adequate royalty reports and has failed to distribute royalty payments to TimeGate in accordance with the terms of the Publishing Agreement.   Furthermore, Gamecock has erroneously calculated revenue due to TimeGate through its skewed interpretation of the clear definition of "COGS".

71.     As a proximate result of Gamecock's breach, TimeGate has incurred actual damages and is entitled to attorney's fees under Section 38.001 of the Texas Civil Practices and Remedies Code.

### <u>COUNT TWO</u>

### COMMON LAW TRADEMARK INFRINGEMENT,VIOLATIONS OF THE LANHAM ACT UNDER 15 U.S.C. § 1114, AND FALSE DESIGNATION OF ORIGIN, 15 U.S.C. §§ 1125(A) AGAINST SOUTHPEAK

72.     TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

73.     SouthPeak's acts constitute common law trademark infringement and unfair competition, violate the Lanham Act, and constitute False Designation of Origin.

74.     TimeGate owns two federally-registered trademarks and a World Intellectual Property Organization registration on the Section 8 mark.  TimeGate has given notice to the public of its registrations of the Section 8 marks as provided in the Lanham Act, 15 U.S.C. § 1111.  TimeGate also owns a federally-registered trademark with respect to the name TimeGate. See Exhibit G, a true and correct copy of the registration. SouthPeak has infringed upon these marks by using them in commerce.

75.     TimeGate owns and uses the TimeGate and Section 8 marks in various forms and styles in connection with the production and sale of entertainment services, video, film, movie, and other publications, including clothing, toys and games, and computer software.

76.     TimeGate owns and enjoys common law rights in Texas, the United States and other countries in and to the TimeGate and Section 8 marks for products and services associated with, *inter alia,*  the Section 8 video game which are superior to the rights of any third party.

77.     SouthPeak has infringed the TimeGate and Section 8 trademarks by (a) authorizing and permitting retailers to bundle Section 8 games with inferior products by other developers; (b) authorizing and permitting retailers to use the TimeGate and Section 8 trademarks to market and sell inferior products in

combination with Section 8 games; (c) using the TimeGate and Section 8 trademarks to sell discounted copies of Section 8 games and thereby creating the perception in the market that Section 8 is an inferior product; (d) using the TimeGate and Section 8 trademark to promote unauthorized and inferior memorabilia; (e) marketing, promoting and selling a product for which TimeGate has the exclusive marks, and (f) marketing, promoting, and selling versions of the Section 8 game that have not been developed and are not ready for market.

78.   As of the filing of this Second Amended Complaint, SouthPeak continues to infringe upon TimeGate's marks as evidenced by its ongoing attempts to sell the Game on its website and through retailers.  It also registered <joinsection8.net>, <joinsection8.de> and <S8-gate.com> without TimeGate's knowledge or permission.

79.   Moreover, SouthPeak received $250,000.00 from a Russian gaming company for the PS3 version of Section 8, to which it has no intellectual property rights, in further infringement upon TimeGate's marks.

80.   SouthPeak's infringing usage is likely to cause and has caused confusion regarding its unauthorized uses in connection with inferior or non-existent products.

81.   Especially because consumers tend to confuse the role of developer and publisher, confusion is likely to arise and has arisen from SouthPeak's unauthorized use of Section 8's trademarks; specifically, whether TimeGate has endorsed the unauthorized usage.   Further, the likelihood of confusion is probable when

considering the parties operate in the same industry and the general public associates the parties with the Section 8 video game.

82.    TimeGate has suffered and will continue to suffer losses and irreparable injury to its business reputation and goodwill due to the unauthorized usage and confusion.

83.     SouthPeak knew that its unauthorized use of the marks would result in a benefit to it.

84.    SouthPeak's actions as described herein constitute trademark infringement in violation of the Lanham Act, 15 U.S.C. §1114(1), unfair competition under the Lanham Act, and false designation of origin, all in violation of 15 U.S.C. § 1125(a)

85.    Moreover, SouthPeak's acts constitute unfair competition under Texas state law. As a direct and proximate result of SouthPeak's conduct, including SouthPeak's bad faith, TimeGate has suffered actual damages.

86.    The conduct of SouthPeak has been and continues to be intentional, willful and in bad faith which, in turn, entitles TimeGate to damages for each and every copy of Section 8 manufactured, all other items bearing the TimeGate and/or Section 8 marks and attorney's fees and treble damages under 15 U.S.C.A. § 1117.

87.  TimeGate also requests an injunction enjoining SouthPeak's further use of the TimeGate and Section 8 marks in any manner.

88.   TimeGate has no adequate remedy at law as it is suffering irreparable injury, and no threatened injury to SouthPeak exists, as only TimeGate has the rights to its intellectual property and its marks.

89.   Accordingly, injunctive relief will not disserve the public interest.

## COUNT THREE

### TRADEMARK DILUTION UNDER THE TEXAS BUSINESS AND COMMERCE CODE AGAINST SOUTHPEAK

90.   TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

91.   Section 16.29 of the Texas Business and Commerce Code provides for protection against acts which are "likely to injure a business reputation or dilute the distinctive quality of a mark . . . regardless of whether there is competition between the parties or confusion as to the source of goods or services."

92.   SouthPeak has engaged in acts that have tarnished and/or blurred the TimeGate and Section 8 marks and injured TimeGate's business reputation under Section 16.29 of the Texas Business and Commerce Code.

93.   Specifically, SouthPeak has tarnished and/or blurred the TimeGate and/or Section 8 marks by (a) authorizing and permitting retailers to bundle Section 8 games with inferior products by other developers; (b) authorizing and permitting retailers to market and sell Section 8 games in combination with inferior products by other developers; (c) discounting the price of Section 8 games far below the price agreed upon by the parties and creating the perception in the market that Section 8 is an inferior product; (d) using the TimeGate and/or Section 8 trademarks to promote unauthorized and inferior memorabilia; and (e) marketing, promoting, and

selling versions of the Section 8 game that have not been developed and are not ready for market.

94.    These acts are likely to injure the business reputation of TimeGate and to tarnish and/or blur the distinctive quality of the distinctive TimeGate and/or Section 8 marks.

95.    In addition, TimeGate has suffered and will continue to suffer losses and irreparable injury to its business reputation and goodwill if SouthPeak's actions continue.

96.    SouthPeak is likely to continue to commit activities in violation of Section 16.29 of the Texas Business and Commerce Code by both blurring and tarnishing the TimeGate and/or Section 8 marks, and unless restrained and enjoined, will continue to do so, all to TimeGate's irreparable injury.

## <u>COUNT FOUR</u>

### COPYRIGHT INFRINGEMENT UNDER THE UNITED STATES COPYRIGHT ACT, 17 U.S.C. § 101 ET SEQ. AGAINST SOUTHPEAK

97.    TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

98.    TimeGate is the owner of the federally registered Section 8 copyright which is registered with the United States Copyright Office and is protected under the United States Copyright Act, 17 U.S.C. § 101 et seq.  The public has received fair notice of TimeGate's copyright pursuant to the provisions of the Lanham Act.

99.    TimeGate has complied in all respects with the Copyright Act, 17 U.S.C. §101, *et seq*., and all other applicable copyright laws.

100.. TimeGate received from the Register of Copyrights a certificate of registration dated December 15, 2009, pertaining to Section 8.

101. Since that date, TimeGate has been the sole proprietor of all rights, title and interest in and to the copyright to Section 8.

102. After December 15, 2009, SouthPeak violated the Copyright Act, 17 U.S.C. § 106 (3) by distributing copies of Section 8, copyrighted material to which TimeGate has exclusive rights. SouthPeak acted intentionally and knowingly in infringing upon the Section 8 copyrighted work. Its acts of marketing, selling and distributing the Game without permission have damaged TimeGate.

103. As a result of said infringement, TimeGate has suffered actual damages, and seeks amounts which SouthPeak has profited from such infringement..

104. Additionally, TimeGate seeks a finding that SouthPeak's infringement was willful pursuant to 17 U.S.C. § 504(c)(2).

105 TimeGate also requests an injunction enjoining SouthPeak's use of the copyrighted Section 8.

106. TimeGate has no adequate remedy at law, as SouthPeak's continued unauthorized use of the copyrighted material will cause irreparable injury.

107. There is also no threatened injury to SouthPeak, given that TimeGate possesses the ownership rights in its intellectual property. Accordingly, injunctive relief will not disserve the public interest.

## COUNT FIVE

**CONTRIBUTORY COPYRIGHT AND TRADEMARK INFRINGMENT UNDER THE COPYRIGHT AND LANHAM ACTS AGAINST SOUTHPEAK**

108.   TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

109.   Through its conduct, SouthPeak has engaged and continue to engage in the business of knowingly and systematically inducing, causing, and materially contributing to the above-described unauthorized distribution of copies of the Game which infringes upon Section 8's copyright and trademarks.

110.   SouthPeak acted intentionally and knowingly in infringing upon the Section 8 copyrighted work and has damaged TimeGate.

111.   SouthPeak's conduct constitutes contributory infringement of TimeGate's copyright in violation of § 501 of the Copyright Act of 1976 as amended, 17 U.S.C. § 101 et seq. as well as infringement of TimeGate's trademarks in violation of sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a).

112.   As such, TimeGate is entitled to recover actual damages on its claim for contributory copyright and trademark infringement.

## COUNT SIX

**FRAUDULENT CONVEYANCE PURSUANT TO TEX. BUS. & COM. CODE SECTION 24.005 AGAINST SOUTHPEAK**

113.   TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

114.   SouthPeak has transferred Gamecock's right to distribute, market and sell Gamecock-published video games, including Section 8, to itself via a self-serving Distribution "Agreement" executed by Defendant Terry M. Phillips on behalf of both

entities. The "agreement" also provided SouthPeak the right to provide all retail mark downs and other concessions to retailers and other resellers, and pay itself distribution fees and expenses purportedly to apply to Gamecock liabilities.

115.   SouthPeak has taken the position that Gamecock received no revenue for sales attributable to Section 8.   SouthPeak clearly entered into the agreement with the intent to retain the revenues relating to the sales, distribution and marketing of Section 8.

116.   SouthPeak's transfer of rights was fraudulent as to TimeGate, as the transfer was made with the actual intent to hinder, delay and/or defraud TimeGate with respect to the royalties owed by Gamecock to TimeGate for sales, marketing and distribution of Section 8.   SouthPeak's fraudulent intent is evidenced by, *inter alia,* its concealing the existence of the Distribution Agreement, that SouthPeak had been sued and threatened with other suits, and Gamecock's insolvency as stated in the Distribution Agreement, as well as SouthPeak's precarious financial condition at the time of the transfer.

117.   By reason of the foregoing, TimeGate is entitled to actual damages resulting from SouthPeak's fraudulent conveyance.

## COUNT SEVEN

### CONVERSION AGAINST SOUTHPEAK

118.   TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

119. SouthPeak is liable to GameCock for its unlawful conversion of TimeGate's Section 8 intellectual property rights.

120,    TimeGate owns the intellectual property rights to Section 8, its personal property, and has the right to authorize any distribution of Section 8 or Section 8 memorabilia or merchandise.

121.    SouthPeak has wrongfully exercised dominion and control over the property rights which TimeGate owns for Section 8 by, *inter alia*, promoting, marketing, selling and distributing Section 8 and Section 8 memorabilia and merchandise without any authorization by TimeGate, and registering domain names relating to Section 8 without TimeGate's knowledge or authorization.

122.    As a result, TimeGate has suffered injury, and seeks the return of each and every Section 8 Game, actual damages for its actual losses and injuries, and lost profits, as well as exemplary damages and court costs.

<u>**COUNT EIGHT**</u>

**NEGLIGENCE AGAINST TERRY M. PHILLIPS, INDIVIDUALLY**

123    TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

124.    Defendant Terry M. Phillips is the Chairman of SouthPeak and has also identified himself as the Chairman of Gamecock on the parties' Distribution "Agreement", which he executed on behalf of both individuals.

125.    Phillips is individually liable to TimeGate for his negligence in relation to the execution of, and his failure to disclose, said Distribution "Agreement" purportedly between Gamecock and SouthPeak.  The "agreement" expressly states that Gamecock is insolvent, and grants SouthPeak certain rights with regard to Section 8 in violation of the Publishing Agreement between TimeGate and

Gamecock.  Phillips, as Chairman for Gamecock, owed TimeGate an independent duty of reasonable care, including, but not limited to, the duty to disclose any condition which would allow TimeGate to terminate the Publishing Agreement between TimeGate and Gamecock. By executing the "agreement" as Chairman for both Gamecock and SouthPeak, and failing to inform Timegate of its existence and its content, Phillips failed to exercise reasonable care.

126.   In acting as an "interested" individual by transacting business between two corporations for which he has identified himself as Chairman, Phillips has damaged TimeGate. Phillips' failure to exercise reasonable care and failure to disclose Gamecock's insolvency as set forth in the Distribution Agreement is the proximate cause of damages to TimeGate.

**COUNT NINE**

**CONSTRUCTIVE TRUST FOR SECTION 8 REVENUES COLLECTED BY GAMECOCK AND SOUTHPEAK**

127.   TimeGate incorporates paragraphs 1-66 as if fully set forth herein,

128.   SouthPeak is in possession of revenue consisting of profits derived from SouthPeak's unauthorized manufacture, sales and distribution of Section 8. Additionally, upon information and belief, millions of dollars have not been collected from retailers for the sales of Section 8.

129.   SouthPeak has engaged in fraudulent activities, and sham transactions between Gamecock and SouthPeak have concealed Section 8 sales revenues from TimeGate. Specifically, SouthPeak has (a) manipulated sales figures on behalf of Gamecock and withheld royalty payments due to TimeGate; (b) engaged

in unauthorized sales activities that infringe upon the Section 8 copyright and trademarks and (c) fraudulently conveyed the transfer of Section 8 and its revenue to itself to avoid compensating TimeGate. TimeGate believes that SouthPeak is hiding and using revenues from Section 8 to pay other corporate debts.

130.　SouthPeak has committed fraud, has numerous lawsuits pending against it and had a judgment awarded against it in November of 2009 for $.4.5 million. TimeGate's financial well-being has decreased significantly, as it has received no revenue which should have been paid as royalties to compensate its 71 employees or pay its vendors. Therefore, TimeGate respectfully requests that the Court impose a constructive trust over the revenue and outstanding receivables for Section 8 to protect revenue to which TimeGate is entitled to from past, present and future sales of Section 8 and its merchandise.

131.　In the alternative, TimeGate requests that this Honorable Court require SouthPeak to post a bond as a result of its current precarious financial status, in a minimum amount of the value of the Section 8 games in its possession, the Section 8 games it has distributed, and the Section 8 memorabilia it has marketed and promoted..

## COUNT TEN

## APPLICATION FOR A RECEIVER, IN THE ALTERNATIVE, FOR FUNDS COLLECTED BY GAMECOCK AND/OR SOUTHPEAK

132.　TimeGate incorporates paragraphs 1-66 as if fully set forth herein.

133.　In the alternative, TimeGate respectfully requests that this Court appoint a receiver over the accounts receivable of both Gamecock and SouthPeak to

protect revenue to which it is entitled  from past, present and future sales of Section 8.

134.   SouthPeak and Gamecock have engaged in fraudulent activities and sham transactions to conceal Section 8 sales revenues from TimeGate.

135.   Specifically, SouthPeak has (a) manipulated cost and revenue accounting for Section 8 sales and provided false royalty reports on behalf of Gamecock; and (b) engaged in unauthorized sales activities that use the Section 8 trademarks and copyright without reporting those sales or the revenue from those sales to TimeGate.

136.   Under SouthPeak's direction, Gamecock also has used sham transactions to prevent Section 8 sales revenue from being recorded or recognized by Gamecock.

137.   Therefore, TimeGate requests that a receiver immediately be appointed over the sales revenues from any product or service that utilizes the Section 8 name or trademarks because (a) TimeGate is a creditor as to Gamecock and to SouthPeak arising from sales of Section 8 games and memorabilia; (b) Time Gate, Gamecock and SouthPeak share a common interest in the revenue from the sales of Section 8; and (c) TimeGate believes that SouthPeak is hiding and using revenues from Section 8 to pay other corporate debts.

138.   Furthermore, the principles of equity dictate that a receiver be appointed as Gamecock and SouthPeak have engaged in fraudulent activity, and an

appointment of an objective third party is necessary to adequately protect TimeGate's interests.

139.   SouthPeak's history of fraud and failure to pay creditors confirms the need for the appointment of a receiver.

140.   These examples further confirm that the appointment of a receiver is necessary to protect TimeGate's interests in revenues that Gamecock and/or SouthPeak are receiving from Section 8 sales.

141.   To this end, TimeGate believes that the appointment of a receiver is necessary to prevent SouthPeak from dissipating revenues that Gamecock and SouthPeak have received from the sales and distribution of Section 8.

## CONDITIONS PRECEDENT

Paragraphs 1-66 are incorporated herein as if fully set forth.

All conditions precedent to the filing of this action have occurred or have been preformed by TimeGate, or have been waived or excused by Defendants.

## JURY DEMAND

TimeGate demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE PREMISES CONSIDERED**, TimeGate Studios, Inc. prays that Defendants be cited to appear and answer, and that upon hearing and final trial of this matter:

(a)   The Court hold a hearing for injunctive relief and for the imposition of a constructive trust, deposit of a bond into the registry of the Court and/or the

appointment of a receiver;

(b)     That in connection with said hearing for injunctive relief, SouthPeak and its officers, employees, agents, servants, attorneys, successors and assigns, related companies and all those persons in active concert or participation with it, be enjoined and restrained from continuing to infringe upon TimeGate's copyrighted Game and trademarks, cease its marketing, promotion and selling of TimeGate and/or Section 8 and Section 8 memorabilia and merchandise, and return TimeGate's intellectual property;

(c)     That in connection with said hearing, this Honorable Court impose a constructive trust as to all past and future revenue generated from any source resulting from authorized and unauthorized sales of Section 8, as well as any revenue generated from sales or marketing of products bearing the TimeGate and/or Section 8 marks, by both Gamecock and SouthPeak, including future revenue from any source, as a result of the wrongful and infringing acts described herein, and for the segregation and holding of such monies for the benefit of TimeGate;

(d)     Or, in connection with said hearing, require SouthPeak to post a bond whose monetary value, at a minimum, equals that of the Section 8 Games in its possession, the Section 8 games it has distributed, and the Section 8 memorabilia it has marketed and promoted;

(e)     That Gamecock pay all damages which TimeGate has incurred as a proximate cause of its breach of the Publishing Agreement, including attorney's fees

pursuant to Section 38.001 of the Texas Civil Practices and Remedies Code;

(f)     That SouthPeak pay all actual and exemplary damages caused by its acts of intentional and willful copyright and trademark infringement as alleged herein, and trebling of such profits in accordance with 15 U.S.C. § 1117;

(g)     That SouthPeak pay attorney's fees pursuant to 15 U.S.C. § 1117;

(h)     That Defendants pay TimeGate prejudgment and postjustment interest at the maximum lawful rates;

(h)     That Terry M. Phillips pay damages to TimeGate as a result of his failure to exercise reasonable care in connection with the execution of the Distribution "Agreement" between Gamecock and SouthPeak; and that

(g)     TimeGate be entitled to any other relief, at law or in equity, which the Court may award in its discretion.

Respectfully submitted,

AHMAD, ZAVITSANOS & ANAIPAKOS, P.C.


   */s/ John Zavitsanos*
John Zavitsanos
State Bar No.  22251650
Debora S. Pacholder
State Bar No. 00784969
Steven J. Mitby
State Bar No. 24037123
Ahmad, Zavitsanos & Anaipakos, P.C.
1221 McKinney, Suite 3460
Houston, Texas  77010
Telephone:  (713) 655-1101
Telecopier:  (713) 655-0062

Scott Weiss, Corporate Counsel
TimeGate Studios, Inc.
Texas State Bar No. 24042134
14140 Southwest Freeway, Ste. 200
Sugar Land, Texas 77478
281-295-4122
832-201-0687 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
TIMEGATE STUDIOS, INC**.