# EXHIBIT F



**TIMEGATE STUDIOS INC**
**REVIEW OF**
**Q3 2009 SECTION 8 ROYALTY REPORT**
**FROM**
**GONE OFF DEEP, LLC/GAMECOCK MEDIA GROUP**
**JANUARY 2010**

## SUMMARY OF FINDINGS

Pursuant to the June 15, 2007 Publishing Agreement between Gone Off Deep, LLC and TimeGate Studios, Inc. ("TimeGate"), a royalty report was required to be provided to TimeGate for each quarter which provided certain financial data regarding its video game, Section 8, released on September 1, 2009.

1. Upon receiving and reviewing the first royalty report for the third quarter of 2009, TimeGate found SouthPeak's data contained in the report to be questionable. The game sold approximately 217k units on XBOX 360 and 87k units on PC, earning sales revenues of $11.3m. However, the royalty report showed that TimeGate had not even recouped its original development costs of $2.5m. As such, it exercised its rights to conduct an audit to verify the data and engaged TCA to do so. The report below only addresses the third quarter of 2009. It should be noted that SouthPeak supplied a revised royalty report on the first day of the audit, which is most unusual. The new report amended the adverse Net Revenue position by $607k, a reduction of 18%. This would imply that SouthPeak itself was unsure of the original implementation of the contractual terms into the royalty report.

The fieldwork at SouthPeak's offices between 6th and 8th January 2010 revealed the following:

1. The accounting processes and systems are substantially robust and generally accurately reflect the title's financial performance, with the exception of the areas noted below.

   a. SouthPeak failed to report European revenues in the amount of $141,337 from Atollsoft, which had received a 1.5% cash discount. SouthPeak should have included these sales and applied a reserve of 15% as per clause 6.6 of the publishing agreement.
   b. SouthPeak could not support all of the $3,164,590 of manufacturing costs shown on the royalty report. Subject to possible differences in exchange translation on the European costs, the manufacturing costs should be lowered by $68,362.
   c. Additionally, some costs were classed as manufacturing costs, but were in fact marketing or translation costs which are not deductible from the gross revenues. The following costs need to be deducted from the total manufacturing costs:
      i. A localization invoice for $65,877 from Translations.com as SouthPeak is responsible for translations.
      ii. Sundry marketing invoices for patches and cards erroneously included as manufacturing totalling $37,797.

    d.   Total manufacturing costs should therefore be $2,992,554 – a reduction of $172,036.

**In total, TCA believes that net revenues were understated by $313,373 on points b and c above.**

2.   TimeGate believes that Gamecock had received an advance of $250,000 from 1C – a Russian publisher – in Q2 2008, as an advance against a sub-licence for the PS3 rights to the game. SouthPeak does not have the rights to sub-licence the PS3 rights and should not have done so. This receipt was never included in the results shown to TimeGate. Email correspondence confirms the existence of the remittance and TimeGate is in possession of an unsigned agreement between 1C and Gamecock.  Further, while Southpeak agreed several times to provide TCA with a copy of the signed agreement, it failed to do so.

During the fieldwork, Avi Lipsker of SouthPeak initially confirmed the receipt of the $250,000 but then claimed that because the agreement was later canceled, Southpeak did not feel it was under any obligation to pay TimeGate despite having kept the payment.  TCA notes, however, that SouthPeak did not provide any documentation suggesting the agreement had, in fact, been cancelled.

**TCA believes that the $250,000 should be paid in full to TimeGate as SouthPeak did not have the PS3 rights in the first place.**

3.   Agreements exist between Phillips Sales Inc and SouthPeak and Gamecock and SouthPeak which have not been incorporated into the royalty report.

- Phillips Sales Inc and SouthPeak Interactive Corp.
  - A sales agency agreement, signed for both parties by Greg Phillips in July 2006

- Gone Off Deep LLC and SouthPeak Interactive Corp.
  - A distribution agreement, signed for both parties by Terry Phillips with a disputed date of October 10, 2008 and providing for a fee of 25% of all invoiced revenue on all Gamecock games distributed by SouthPeak.

4.   SouthPeak has applied the full costs of all manufacturing and other costs expensed in calendar Q3 2009. TCA believes that SouthPeak has misinterpreted the definition of "Cost of Goods Sold" because these costs should only be applied to the sell-through units reported, not the total cost of all units manufactured.

Net Revenues is defined in 1.29 as the "Gross Revenues pertaining to such Revenue Stream, less the Cost of Goods Sold for such Game Units". Gross Revenues, defined in 1.21, is further defined as "the total invoice amount actually received by GOD from the selling of all Game Units (or other items pursuant to this agreement) sold through, ... "

It therefore seems clear that the COGS should only relate to the Game Units actually sold through and shown as such on the royalty report. In this way, from a royalty reporting perspective, sales revenues and costs are matched, but the royalty due to Timegate is fundamentally changed.

**Taking all of the above points into account and using manufacturing standard costs of $9.31 and $1.02 for US XBOX 360 and PC, and $12.10 and $1.53 for Europe, and applying a standard deduction of 1% of net receipts for other costs, TCA estimates that TimeGate should have received a royalty payment of $61,106.Should SouthPeak have elected to retain a reserve of 15% as per clause 6.6 of the contract, this figure would have come down to $51,940.**

SouthPeak's interpretation of the manufacturing costs clause fails to match the sales revenues and the manufacturing costs of the unit sales reported. Furthermore, this approach favours the publisher at the expense of the developer. The games industry standard is to report sales on the basis of units sold to retail, not the end consumer, and to apply standard

costs to the games units so sold. Had this approach been taken for this contract, TimeGate would have expected a royalty to the order of approximately $1.9m.

## CONCLUSIONS

In failing to apply the contractual methodology for calculating COGS, as well as the other accounting errors noted above, SouthPeak has disadvantaged TimeGate by not paying a royalty of $51,940 due on the calendar Q3 2009 results. This amount should be paid immediately. Additionally, SouthPeak should immediately pay TimeGate the $250,000 received for the wrongful sub-licence of the PS3 rights to 1C. The total payable to TimeGate is therefore $301,940.

The fuller picture will emerge once the calendar Q4 royalty report is produced and it is recommended that the production of this report is brought forward as far as possible to provide greater clarity on the overall situation.

T.P.CHRISTIAN
MANAGING DIRECTOR
TCA ASSOCIATES LTD
Date: ..20th... JANUARY  2010

A UK-qualified accountant since 1979, Tim Christian entered the computer games industry in 1991 as Managing Director Europe for Accolade Inc., an American computer games publisher. Prior to that he had held accounting roles at a number of UK blue-chip companies before becoming VP Finance and then VP Europe at CIC Video, the Paramount Pictures and Universal Studios joint-venture responsible for distributing their movies on video outside North America. In 1994, he became Managing Director Europe for Microprose Inc and then Hasbro Interactive Europe, following its 1998 acquisition of Microprose Inc.

Leaving Hasbro in 2000, Christian formed TCA Associates Ltd, focussing on strategic consulting in the computer games industry. In 2002, he formed Media Forensics Ltd, which became the UK's leading independent computer games royalty audit business. He also formed Data Genetics International Ltd, a computer forensics investigations business, which was bought by Stroz Friedberg Inc in December 2008.

In early 2009, Media Forensics Ltd was dissolved and its business folded into TC Associates Ltd, which is now Christian's main focus.

Since 2002, Christian has performed audits at almost all the top US and European publishers for a wide variety of US and European developers. In that time, he has identified and recovered around $25m of previously unreported royalties. He has acted as an expert witness, and has been involved in formal mediation and arbitration proceedings in the US and Europe.

For additional information and customer references please visit www.tc-ltd.com