IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIMEGATE STUDIOS, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:09-CV-3958 |
| | § | |
| SOUTHPEAK INTERACTIVE CORP., | § | JURY DEMANDED |
| ET AL, | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF TIMEGATE STUDIOS, INC.'S
MOTION FOR INJUNCTIVE RELIEF**

Plaintiff TimeGate Studios, Inc. ("TimeGate") respectfully submits this, its Motion for Injunctive Relief, against Defendants SouthPeak Interactive, LLC, SouthPeak Interactive Corporation (collectively "the SouthPeak Defendants"), Gone Off Deep, LLC d/b/a/ GameCock Media Group and Terry Phillips and shows the Court as follows:

**I. OVERVIEW**

1. TimeGate seeks injunctive relief against the SouthPeak Defendants and those in active concert with them based upon the ongoing exploitation and misappropriation of its intellectual property rights in the Section 8® video game and related business interests. ***See* Attached Affidavit of Adel Chavelah, President of TimeGate Studios, Inc.** While the SouthPeak Defendants' failed to secure a legitimate sublicense with respect to the June 15, 2007 TimeGate-Gone Off Deep, LLC Publishing Agreement, they have taken it upon themselves to unlawfully collect and retain all sales revenue, while tarnishing and jeopardizing TimeGate's copyrighted work, trademarks and other intellectual property interests in the Game.[1] ***See* Chaveleh Affidavit—Exhibit "A".**

---
[1] TimeGate terminated the Publishing Agreement on December 10, 2009 and has not received any royalty payments to date in connection with Section 8.

2. Even if the Court determines that the SouthPeak Defendants did, in fact, obtain a sublicense, the terms of the Publishing Agreement were exceeded when, without TimeGate's knowledge or permission, they: (i) manufactured Section 8 goods (shoulder patches) without trademark symbols and included them in copies of the Game sold at Walmart, (ii) organized internet contests which allowed third parties to use TimeGate's marks, (iii) registered infringing domain names for the Game, (iv) participated and profited in the unlawful licensing of Section 8 on the Sony PlayStation 3 and (v) removed all copyright and trademark disclaimers for the Game on their website. *See* **Chaveleh Affidavit—Exhibit "B".** Additionally, one or more Defendants have harassed Sony Computer Entertainment America Inc. and others in an attempt to harm TimeGate's current business relationships related to Section 8. *See* **Chaveleh Affidavit— Exhibit "C".**

3. The combination of the above-referenced acts have caused an economic strain on TimeGate and created a situation where its ability to control its copyrighted work and trademarks is in jeopardy. Given that there is no adequate remedy at law, injunctive relief is warranted.

## II. FACTUAL BACKGROUND

4. Founded in 1998, TimeGate is a leading developer of video game software for PCs and game consoles, including Microsoft's Xbox 360. In 2005, TimeGate began developing Section 8, a highly intense, interactive video game which would allow multiple players in various locations to play against each other.

### A. REGISTERED COPYRIGHT AND TRADEMARKS

5. In order to protect its intellectual property, TimeGate registered Section 8 with the United States Copyright Office and obtained a federal copyright registration under PA 1-654-092 for the computer program and the audiovisual material associated with it.[2] TimeGate also

---

[2] In the Fifth Circuit, the registration requirement in § 411(a) is met when "the Copyright Office actually receive[s]

registered Section 8 with the United States Patent and Trademark Office and obtained two federal trademark registrations under Registration Nos. 3681498 and 3644534 for computer game software.  Likewise, TimeGate also obtained an international trademark registration for Section 8 under World Intellectual Property Organization Registration No. 989209.  All registrations are distinct, valid and subsisting and in full force and effect. *See* **Chaveleh Affidavit—Exhibit "D".**

### B. THE PUBLISHING AGREEMENT

6. On June 15, 2007, TimeGate and Defendant Gone Off Deep, LLC entered into the Publishing Agreement for the development and release of Section 8.  On October 10, 2008, the SouthPeak Defendants obtained the majority shares in Defendant Gone Off Deep, LLC, but maintained it as a separate and distinct entity. After Section 8's release in September of 2009, TimeGate was scheduled to receive its first royalty payment from sales of the Game.  In November of 2009, TimeGate was told that Defendant Gone Off Deep, LLC had not received any revenue from sales of the Game and thus, it was not entitled to a royalty payment.  Only after accusing Defendants of theft and other illicit acts did TimeGate learned that the SouthPeak Defendants were in possession of all the sales revenue and were withholding it based on an undisclosed distribution agreement ("Distribution Agreement") with Defendant Gone Off Deep, LLC.  Subsequently all Defendants claimed that the Distribution Agreement was essentially a sublicense to the Publishing Agreement. *See* **Chaveleh Affidavit—Exhibit "E".**

### C. THE DISTRIBUTION AGREEMENT

7. At the forefront of the infringement issue is the Distribution Agreement and whether it resulted in the SouthPeak Defendants becoming a sublicensee for purposes of the Publishing

---

the application, deposit, and fee before a plaintiff files an infringement action." *Positive Black Talk Inc. v. Cash Money Records, Inc*., 394 F.3d 357, 365 (5th Cir.2004).  Given that this suit was filed after TimeGate had completed its copyright application on December 8, 2009, the registration requirement has been satisfied.

Agreement. With respect to the Distribution Agreement itself, it was signed on October 10, 2008, but its existence was not disclosed until December of 2009 and TimeGate was not provided with a copy of it until January 2010, yet it has been used as means of unlawfully retaining all sales revenue generated from Section 8. *See* **Chaveleh Affidavit—Exhibit "F".**

### i. The Distribution Agreement Fails for Specificity

8. While the SouthPeak Defendants have claimed that the Distribution Agreement equates to a sublicense, their position is unavailing. Upon reviewing the Distribution Agreement, the Court will note that it fails to specifically reference Section 8, TimeGate, TimeGate's exclusive rights in the copyrighted work and trademarks for Section 8, the Publishing Agreement or the obligations thereunder.[3] The Fifth Circuit has held that a contract may fail for indefiniteness, especially with respect to a license, because it does not provide for the owner to retain control over its mark, which can lead to abandonment. *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323-26 (5th Cir.2006).

9. Given the Distribution Agreement's lack of specificity, it fails to impose the same obligations on the SouthPeak Defendants (as an alleged sublicensee of TimeGate) as the Publishing Agreement placed on Defendant Gone Off Deep, LLC (as a true licensee of TimeGate). Therefore, if the Distribution Agreement was presumed to be a sublicense, TimeGate would lose the ability to control its copyrighted work and trademarks. As such, it fails as a matter of law.

### ii. The Distribution Agreement is Invalid Under the Publishing Agreement

10. Not only does the Distribution Agreement fail to meet the minimum requirements for a sublicense, it is void under Section 2.9 of the Publishing Agreement. Specifically, Section 2.9 states that "GOD's [Defendant Gone Off Deep, LLC] right to sublicense its rights to the Game

---

[3] The Distribution Agreement simply references "Games" which at the time, Defendant Gone Off Deep, LLC was the publisher of record for. Accordingly, it cannot be determined what specific "games" were being referred to.

for purposes other than as expressly set forth in this Agreement shall be subject to, and no such sublicense shall be valid except upon, prior approval by Developer, such approval shall not be unreasonably withheld."

11. As set forth in Paragraph 8 of the Distribution Agreement, the purpose of the attempted sublicense was for the SouthPeak Defendants to retain all sales revenue from Section 8 and pay off Defendant Gone Off Deep, LLC's *other* creditors, leaving TimeGate without its royalty payments. This was not expressly set forth in the Publishing Agreement and therefore TimeGate's prior approval was required, but never sought. As a result, any attempted sublicense was invalid. And while the SouthPeak Defendants have argued that TimeGate could not unreasonably withhold its approval, it would be completely illogical for it to agree to a sublicense that allows a third party to essentially steal its royalties and pay off other parties.

12. Knowing full well that it would never agree to a scheme of this nature, this is the very reason the existence of the Distribution Agreement was withheld from TimeGate and its approval was never sought. Unfortunately for Defendants, if a licensing agreement requires the licensee to obtain approval prior to entering into a sublicensing agreement, the failure to obtain it makes the sublicense invalid because it was entered into outside of the scope of the authority granted. *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.,* 729 F.Supp. 1035, 1042 (D.N.J.1990).

### iii. TimeGate did not Provide its "Tacit Approval" for Purposes of a Sublicense

13. As a last ditch effort to convince the Court that the Distribution Agreement is a sublicense, the SouthPeak Defendants have previously claimed that TimeGate gave its tacit approval to the arrangement because it knew the SouthPeak Defendants' level of involvement in the project and received milestone payments from them. Not only is it impossible to impliedly consent to a sublicensing agreement it has never seen, accepting payment for work performed

5

does not equate to a party's approval of a license. *Id.* at 1044 ("royalties tendered directly by defendant and accepted by plaintiff did not act as a confirmation of a license or as a waiver of a copyright infringement claim.").

14. TimeGate does not deny it was aware of the SouthPeak Defendants' existence; however, their role was completely misconstrued given that after they made their presence known, Defendant Gone Off Deep, LLC signed every amendment to the Publishing Agreement, continued to make certain milestone payments to TimeGate and the SouthPeak Defendants referred to themselves as Defendant Gone Off Deep, LLC. *See* **Chaveleh Affidavit—Exhibit "G".**

15. In fact, the first time a true distinction between the SouthPeak Defendants and Defendant Gone Off Deep, LLC was made was after TimeGate demanded its royalty payments, it was told that the SouthPeak Defendants were in possession of them, but owed no obligation to pay them. Finally, as evidenced in the corresponding exhibit, TimeGate never consented or waived its rights as previously suggested. *See* **Chaveleh Affidavit—Exhibit "H".**

**D. TERMINATION OF THE PUBLISHING AGREEMENT**

16. On December 10, 2009, TimeGate exercised its right to terminate the Publishing Agreement under Section 18.1(d)(B) for Defendant Gone Off Deep, LLC's insolvency, as well as for other reasons that amounted to a material breach.[4] At the time, the SouthPeak Defendants were in control of every aspect of Section 8, were profiting from its sale and were freely using TimeGate's copyrighted work and trademarks as they saw fit. Despite being on notice of the

---

[4] The SouthPeak Defendants contend that despite TimeGate's termination of the Publishing Agreement, Section 18.3 provided them with an additional nine months to market and distribute the Game. However, not only are they not sublicensees, Section 18.3 could only be triggered through termination by Defendant Gone Off Deep, LLC (GOD). This is supported by sections 18.1 through 18.4 (excluding 18.1(d)) which address different scenarios involving a Gone Off Deep, LLC's termination based on a material breach by TimeGate, while sections 18.5 (a) and (b) address different scenarios involving a TimeGate's termination based on a material breach by Gone Off Deep, LLC. Also, under the SouthPeak Defendants' interpretation, sections 18.3 and 18.5 conflict with each other.

termination and receiving a cease and desist letter in February of 2010, the SouthPeak Defendants have continued to infringe upon TimeGate's intellectual property. *See* **Chaveleh Affidavit—Exhibit "I".**

### III. INJUNCTIVE RELIEF

17. To protect its intellectual property and future business interests, TimeGate seeks injunctive relief in this instance and can show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the non-movant; and (4) granting the injunction is not adverse to the public interest. *Boyd v. Roland*, 789 F.2d 347, 349 (5th Cir.1986). To support its application, TimeGate is willing to post a bond in an amount determined by the Court.

**A. LIKELIHOOD OF SUCCESS ON THE MERITS FOR COPYRIGHT INFRINGEMENT**

18. TimeGate has alleged that one or more Defendants have infringed upon its copyrighted work through their acts of copying, manufacturing, promoting, bundling, selling and distributing Section 8 through distributors, retailers and their own website without TimeGate's permission. To prove copyright infringement, TimeGate must show ownership of a valid copyright and actionable copying. *Galiano v. Harrah's Operating Co., Inc*., 416 F.3d 411, 414 (5th Cir.2005).

**i. Copyright Infringement for Acts Without a Sublicense**

19. As previously shown, TimeGate owns the federally registered copyright for Section 8 on file with the United States Copyright Office  With respect to actionable copying, TimeGate contends that because the SouthPeak Defendants never held a legitimate sublicense to the Publishing Agreement, their acts of copying, manufacturing, promoting, bundling copies of Section 8 with other titles, selling and distributing copies of Section 8 through distributors,

retailers and their own website were without TimeGate's permission and constitutes copyright infringement. *Cynthia Hunt Prods. v. Evolution of Fitness Houston*, 2007 WL 3047220 at * 1 (S.D.Tex.2007) (enjoining acts of displaying copyrighted material without compensating the owner for the right to do so).

20.  Likewise, the SouthPeak Defendants have and are currently displaying Section 8 for sale on their website, but have removed its copyright and trademark disclaimers.  Because of this and other intentional acts, the consuming public has become confused as to who actually owns the copyrighted work for Section 8.  *See* **Chaveleh Affidavit—Exhibit "J".**

**ii. Copyright Infringement for Exceeding the Scope of the Publishing Agreement**

21. Even if it is assumed that there was, in fact, a valid sublicense, the scope of the license was exceeded when the PlayStation 3 version of Section 8 was licensed to a Russian gaming company, 1C, without TimeGate's permission and in direct violation of the recital section and Section 10.2 of the Publishing Agreement.  Specifically, Defendant Gone Off Deep, LLC arranged the transaction and the SouthPeak Defendants' received $250,000.00 as a result.  Subsequently, the license was canceled, yet the SouthPeak Defendants were permitted to retain 1C's $250,000.00 as a cancelation fee.  And while the SouthPeak Defendants have now readily admitted they received the money, they have kept it for themselves. The actions of both Defendant Gone Off Deep, LLC and the SouthPeak Defendants constitute copyright infringement because actionable copying exists where the scope of a license was exceeded. 17 U.S.C.A. § 106; *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir.1996).

**iii. Copyright Infringement for Acts After Termination of the Publishing Agreement**

22. Even with the possibility that a legitimate sublicense existed, it cannot be refuted that the SouthPeak Defendants' rights were unequivocally terminated on December 10, 2009 when TimeGate not only ended its contractual relationship with Defendant Gone Off Deep, LLC, but

filed this lawsuit. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 452-53 (5th Cir.2003) (holding that issuance of a lawsuit is sufficient to constitute revocation of a license). Therefore, at a minimum, all acts by the SouthPeak Defendants occurring after December 10, 2009 in connection with Section 8 are considered to be infringing. *Costello v. Lungaro*, 54 F.3d 776 (6th Cir. 1995) ("Therefore, given Lungaro's continued use and enjoyment of the benefits under the Sub-License Agreement after its termination, the district court's entry of summary judgment for such trademark and copyright infringement is affirmed.").

23. The SouthPeak Defendants have previously disregarded TimeGate's exclusive rights in its copyrighted work and have failed to show any signs of self-restraint in the future. Therefore, TimeGate contends that a permanent injunction is warranted to prevent infringement of its copyright. 17 U.S.C. § 502(a).

### B. LIKELIHOOD OF SUCCESS ON THE MERITS FOR TRADEMARK INFRINGEMENT

24. To establish a claim for trademark infringement under the Lanham Act, TimeGate must show that it has a protectable mark, that one or more Defendants used its mark in commerce which caused confusion or mistake as to the affiliation, connection, or association with TimeGate and damages resulted. *Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 460 (5th Cir.2003).

#### i. Trademark Infringement for Acts Without a Sublicense

25. As previously shown, it is undisputed that TimeGate is the owner in the Section 8 trademarks, all of which are distinctive and are currently in use. It is also undisputed that despite not having a sublicense, the SouthPeak Defendants have used the marks in commerce, which has not only caused confusion and a false connection with TimeGate, but resulted in damages through their retention of all sales revenue generated from the Game. When dealing with a license, the right to use another party's mark is generally in exchange for a royalty or other

payment. *Brennan's, Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 364 (5th Cir.2004); *Prof' l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir.1975) ("falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement."). Therefore, the SouthPeak Defendants' acts constitute trademark infringement. These acts have caused confusion in general, but also as to who actually owns the marks for Section 8.

### ii. Trademark Infringement for Exceeding the Scope of the Publishing Agreement

26. If a sublicense did, in fact, exist, the SouthPeak Defendants' rights and obligations regarding the Section 8 marks were defined by the terms of the Publishing Agreement. Therefore, under Section 20.12 of the Publishing Agreement, the scope of those terms were exceeded when the SouthPeak Defendants' manufactured Section 8 shoulder patches and included them in copies of the Game sold at Walmart without permission, as well as when they held the internet contest allowing third-parties to create t-shirts using the marks.[5]

27. Importantly, the entire purpose of Section 20.12 was a checks and balance system for TimeGate to ensure that it did not lose control of its marks. The failure to allow TimeGate to approve these items not only exceeded the scope of the terms, but resulted in the Section 8 patches being produced without any trademark designation and a cheap marketing gimmick in the form of the t-shirt contest. These acts clearly amount to trademark infringement when considered the limitations in the Publishing Agreement in comparison to the liberties taken with the Section 8 marks. *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 364 (5th Cir.2004).

---

[5] Section 20.12 states as follows:

> 20.12. With respect to all trademark licenses granted hereunder to any party, the owner thereof shall have the right to inspect and approve the quality of any goods or services produced in accordance with or subject to the license. Such approval shall not be unreasonably withheld; provided, however, that the quality of the goods or services produced by licensee is substantially similar to the quality of the goods and services produced under the same trademark by licensor.

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:30 (4th ed.) ("use by a licensee which is outside the scope of the license is both trademark infringement and breach of contract.").

28. Another example of exceeding the terms of the Publishing Agreement is exemplified in the SouthPeak Defendants' registration of four infringing domain names, followed by their intentional failure to disclose their existence.[6] Given that TimeGate is the registered owner of the Section 8 marks and corresponding domain names, their actions violated Section 2.2 of the Publishing Agreement which states "GOD agrees not to seek registration or to claim ownership of any of the Game Trademarks or of any confusingly similar trademarks or trade names."

### ii. Trademark Infringement for Acts After Termination of the Publishing Agreement

29. As a final scenario, whether the SouthPeak Defendants did or did not have a sublicense, their actions still constitute trademark infringement because they have continued using the Section 8 marks beyond December 10, 2009. *Brennan's, Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 364 (5th Cir.2004) ("With regard to licenses, the prevailing view is that one who exceeds the scope of the license is potentially liable not just for breach of the license agreement but also for trademark infringement"); *7-Eleven, Inc. v. Puerto Rico-7, Inc*., 2009 WL 4723199 at 9* (N.D. Tex. 2009) ("The Fifth Circuit has held that the continued use of a trademark by one whose trademark license has been canceled satisfies the likelihood of confusion test and constitutes trademark infringement"); 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:30, FN 2 (4th ed.) ("continued use by an ex-licensee after the license has been terminated is an act of trademark infringement.").

30. Similar to their acts in violation of TimeGate's copyright, the SouthPeak Defendants have previously disregarded its exclusive trademark rights and have failed to show any signs of

---

[6] www.joinsection8.de, www.joinsection8.info, www.joinsection8.net and www.S8-gate.com.

self-restraint in the future. Therefore, TimeGate contends that a permanent injunction is warranted to prevent infringement of its trademarks. 15 U.S.C. § 1116(a).

## C. IRREPARABLE HARM

31. TimeGate has and will continue to be harmed if injunctive relief is not granted when considering that money damages would not fully repair the irreparable harm. Not only have the SouthPeak Defendants previously retained all of the sales revenue to TimeGate's detriment, they continue to infringe upon its copyrighted work and trademarks in Section 8 for purposes of selling the Game in order to generate additional profit at TimeGate's expense.

32. Additionally, one or more Defendants have also intentionally disrupted TimeGate's current and future business relationships with respect to Section 8. Specifically, on March 26, 2010, West Short, Defendants' counsel, sent Sony Computer Entertainment of America ("Sony") a cease and desist letter demanding that it stop all publication and distribution efforts associated with the PlayStation 3 version of Section 8 because Defendant Gone Off Deep, LLC was never afforded the right of first refusal to publish on this platform, which violated the Publishing Agreement's terms.

33. Contrary to Mr. Short's statements to Sony, Defendant Gone Off Deep, LLC was, in fact, provided with the right of first refusal in February of 2009 to publish the PlayStation 3 version of Section 8, yet it failed to respond. Ultimately, TimeGate made the decision to self-publish the PlayStation 3 version, which would not even trigger the right of first refusal. TimeGate's self-publication was acknowledged by Defendants *prior* to the letter being sent to Sony and they were also provided with a copy of the original right of first refusal letter upon request. *See* **Chaveleh Affidavit—Exhibit "K".**

34. Despite the fact that this matter was in litigation and that the Publishing Agreement had previously been terminated, Defendants' counsel continued to harass Sony even after being

provided with this information for purposes of disrupting TimeGate's business interests as it relates to Section 8. In similar fashion, TimeGate has also learned of other, more recent instances where one or more Defendants have taken similar actions to harm TimeGate.

35. TimeGate also directs the Court's attention to the irreparable harm caused as a result of its inability to control the manner in which its copyrighted work and trademarks for Section 8 have been previously exploited and is currently ongoing. *Twentieth Century Fox Film Corporation v. IcraveTV*, 2000 WL 255989 *8 (W.D.Pa.2000) (copyright owners' inability to control its mark considered irreparable harm); *Phillip Morris USA Inc. v. Lee*, 549 F.Supp.2d 839, 850 (W.D.Tex.2008) (trademark owner's inability to control its mark considered irreparable harm). Further, TimeGate presently employs approximately 65 individuals and its current financial status has caused layoffs to occur along with other hardships which are directly attributable to the SouthPeak Defendants' intentional failure to compensate TimeGate for monies earned from sales of Section 8.

36. Moreover, given the SouthPeak Defendants' reputation for unethical business practices, propensity to infringe on others' intellectual property, the ongoing investigation by the Securities and Exchange Commission, as well as the unconscionable acts of Defendant Terry Phillips as previously determined by the Securities and Exchange Commission, TimeGate's reputation and the goodwill associated with its intellectual property has been tarnished by the unfortunate association with them. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1053-56 (5th Cir.1997) (holding potential damage to reputation constitutes irreparable harm); *Universal City Studios v. Kamar Industries*, 1982 WL 1278 *1 (S.D.Tex.1982). TimeGate contends that given the intentional acts of infringement, as well Defendants' counsel admission in the June 29, 2010 hearing that the SouthPeak Defendants are the "alter ego" of Defendant Gone Off Deep, LLC, all Defendants should be enjoined, including Terry Phillips and other corporate officers

13

given that "[A]n individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for infringement." *Stumm v. Drive Entertainment, Inc*., 2002 WL 5589, *5 (S.D.N.Y.2002).

### D. BALANCE OF HARDSHIPS

37. In this instance, the balance of hardships clearly falls in TimeGate's favor because the only hardship that any Defendants will suffer is lost profits from an activity which has been shown to be infringing and merits little equitable consideration. *Helene Curtis Industries v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1333 (7th Cir.1977). As with irreparable injury, the balance of hardships factor is generally regarded as insignificant in a copyright infringement action. *Thimbleberries, Inc. v. C & F Enterprises, Inc*., 142 F.Supp.2d 1132, 1141 (D.Minn.2001) ("[a] willful infringer which seeks to profit by copying others' creative ideas should not be heard to complain that its interests will be disturbed by an injunction.").

38. Upon considering the balance of harm to the parties, the Court must weigh the injury to TimeGate absent an injunction such as the continued deprivation of its right to control its copyrighted work and trademarks, diminution of its reputation, the ongoing interference with its current business relationships related to Section 8 and the overall financial detriment incurred. As such, the injury to TimeGate would be detrimental in the event an injunction was not entered.

### E. THE REQUESTED INJUNCTION WOULD NOT DISSERVE THE PUBLIC INTEREST

39. Regarding the public interest and copyright infringement, it is axiomatic that it can only be served by upholding copyright protection and preventing not only confusion, but the misappropriation of the skills, creative energies, and resources which have been invested by TimeGate in Section 8. *DSC Comms. Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir.1996). Regarding the public interest and trademark infringement, it will be served by

terminating the improper use of trademarks and making such misconduct unprofitable. *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir.2002). Without question, requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks serves the public interest at large. *Quantum Fitness Corp. v. Quantum Lifestyle Centers, L.L.C.*, 83 F.Supp.2d 810, 832 (S.D.Tex.1999).

**F. The Resulting Effect of the Infringement**

40. In sum, the resulting effect of the infringement is that *all* revenue received from sales of Section 8 should be surrendered to TimeGate because it is currently in the SouthPeak Defendants' possession despite not being entitled to it. The actions of Defendants are not isolated; rather, this is a common theme that will continue to happen if their actions are not enjoined. *See* **Chaveleh Affidavit—Exhibit "L"**.

41. And while they might admit that they have infringed upon TimeGate's rights, they will inevitably attempt to raise an argument that "Cost of Goods" sold needs to be determined before any revenue is set aside. However, infringement does not entitle such a determination, nor was the Publishing Agreement intended to be interpreted in accordance with their position. *See* **Chaveleh Affidavit—Exhibit "M"**.

## IV. PRAYER FOR RELIEF

42. In accordance with Rule 65(a)(2)of the Federal Rules of Civil Procedure, TimeGate prays that the Court set this matter for hearing and consolidate it with a trial on the merits, followed by entering an order that includes a permanent injunction as follows:[7]

(a) Defendants, their officers, employees, agents, servants, attorneys, successors and assigns, related companies and all those persons in active concert or participation with them, be enjoined from copying, manufacturing, promoting, selling, collecting revenue on or distributing

---

[7] In the alternative, TimeGate seeks a preliminary injunction.

any item associated with Section 8;

 (b) Defendants, their officers, employees, agents, servants, attorneys, successors and assigns, related companies and all those persons in active concert or participation with them, be enjoined from interfering with TimeGate's business relationships in connection with Section 8;

 (c) Defendants, their officers, employees, agents, servants, attorneys, successors and assigns, related companies and all those persons in active concert or participation with them, be required to obtain all outstanding copies of Section 8 from distributors, retailers or any other third party it is sold by, together with all remaining copies in Defendants' possession and deliver them to TimeGate's corporate office;

 (d) Award TimeGate any and all damages incurred as a result of Defendants' acts of intentional copyright and trademark infringement, which includes all sales revenue received from sales of Section 8, or in the alternative, post a bond in the amount of revenue received;

 (e) Award TimeGate its attorney's fees as a result of Defendants' intentional acts of infringement under the Copyright and Lanham Acts; and

 (f) Award TimeGate such other relief as the Court may deem appropriate.

Respectfully submitted,

By: /s/ Scott Weiss
Scott Weiss, Corporate Counsel
TimeGate Studios, Inc.
Texas Bar No.: 24042134
14140 Southwest Freeway, Suite 200
Sugar Land, Texas 77478
281-295-4122 (Direct)
832-201-0687 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
TIMEGATE STUDIOS, INC.**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the foregoing has been served on Defendants' counsel via the ECF system on July 31, 2010.

_____
Scott Weiss