# EXHIBIT "H"

## Weiss, Scott

**From:**     Weiss, Scott
**Sent:**     Thursday, January 21, 2010 12:21 PM
**To:**       'dstelzer@southpeakgames.com
**Subject:** RE: Section 8 Avatar Items

David-

TimeGate is not willing to provide its approval on this issue, nor is it willing to provide Southpeak with the files.

**From:** David Stelzer @ SouthPeak [mailto:dstelzer@southpeakgames.com]
**Sent:** Thursday, January 21, 2010 11:04 AM
**To:** Weiss, Scott
**Subject:** FW: Section 8 Avatar Items
**Importance:** High

Scott:

Per our conversation, we need to get approval, as well as certain files from TimeGate in order to get avatars and other DLC up on XBLA.  We need to get these today, or they will not be able to go live until much later this year.  Please see below for what is needed.

Obviously, any assistance provided will not be considered a waiver of any possible remedies and claims you have in the current litigation.  Thanks for your help.

Best regards,

David Stelzer

 DAVID STELZER | Vice President/General Counsel
2563 SW Grapevine Pkwy, Grapevine TX 76051 |
Office: (817) 305.0055 | Cell: (323) 842-8134 | Fax (817) 488-4958
www.southpeakgames.com

# EXHIBIT "I"



December 10, 2009

Mr. David Stelzer
Southpeak Interactive
2563 SW Grapevine Pkwy
Grapevine Texas 76051

      Re: Notice of Termination

Dear David:

Pursuant to my email yesterday, this correspondence is to serve as TimeGate Studios, Inc.'s notice of termination of the June 15, 2007 publishing agreement due to Gamecock's insolvency as set forth in an independent accounting on September 30, 2008 and other events. Additionally, your clients have committed a material breach of contract by failing to provide a legitimate royalty statement, pay monies owed with respect to the PS3 and royalties earned and have infringed upon TimeGate's intellectual property. Your clients previously received notice on November 19, 2009 that they had committed a material breach and to date, they have failed to cure.

Please contact me at your earliest convenience in the event you have any questions or would like to discuss the matter in further detail.

             Very truly yours,

             Corporate Counsel
             TimeGate Studios, Inc.



February 8, 2010

SENT VIA ELECTRONIC MAIL

Mr. David Stelzer
General Counsel
Southpeak Interactive
2563 SW Grapevine Pkwy
Grapevine, Texas 76051

      Re: Section 8®

Dear David:

      As previously discussed, Southpeak Interactive is without any rights to TimeGate Studios, Inc.'s Section 8 video game and has unlawfully profited from its sale and distribution to date. As such, TimeGate demands that Southpeak immediately cease all promotional and sales efforts and that each and every copy of the game be returned to its corporate office at the address set forth below by Monday, February 15, 2010.

      TimeGate further requires that all domain names related to Section 8 be transferred to its GoDaddy.com account without further delay. These include, but are not limited to, <joinsection8.de>, <joinsection8.net>, <joinsection8.info> and <S8-gate.com>, all of which were registered by Southpeak without permission and thus, infringe upon TimeGate's intellectual property.

                        Very truly yours,

                        Corporate Counsel
                        TimeGate Studios, Inc.

# EXHIBIT "J"

Wallpaper section8-03.jpg at 1280x1024 for Section 8 on PlayStation 3 - Windows Internet Explorer
http://www.supercheats.com/showwallpaper.php?id=21591&game=section8&size=1280x1024&dir=1600
File Edit View Favorites Tools Help
Google Search Share Sidewiki Sign In Convert Select
Favorites 27 Suggested Sites Web Slice Gallery C.O.N.C.O.R
Wallpaper section8-03.jpg at 1280x1024 for Section ...
Page Safety Tools
SECTION
Error on page.
Internet
100%
start Google 29 Microsoft ... 3 Internet Ex... 24 Microsoft ... AimAtFile

# EXHIBIT "K"

**Weiss, Scott**

| | |
|---|---|
| **From:** | David Stelzer @ SouthPeak [dstelzer@southpeakgames.com] |
| **Sent:** | Tuesday, February 16, 2010 3:29 PM |
| **To:** | Weiss, Scott |
| **Subject:** | RE: |

Nothing wrong. Just in conjunction with our talk earlier. <mark>It looks like the intention is to self publish.</mark>

Best regards,

David Stelzer


DAVID STELZER | Vice President/General Counsel
2563 SW Grapevine Pkwy, Grapevine TX 76051 |
Office: (817) 305.0055 | Cell: (323) 842-8134 | Fax (817) 488-4958
www.southpeakgames.com

**From:** Weiss, Scott [mailto:sweiss@healix.net]
**Sent:** Tuesday, February 16, 2010 3:27 PM
**To:** David Stelzer @ SouthPeak
**Subject:** RE:

Is there something wrong with it that I'm not seeing?

**From:** David Stelzer @ SouthPeak [mailto:dstelzer@southpeakgames.com]
**Sent:** Tuesday, February 16, 2010 3:12 PM
**To:** Weiss, Scott
**Subject:**

Scott:

I just saw this:

<mark>http://www.destructoid.com/timegate-s-section-8-coming-to-psn-this-spring-163926.phtml</mark>

Best regards,

David Stelzer


DAVID STELZER | Vice President/General Counsel
2563 SW Grapevine Pkwy, Grapevine TX 76051 |
Office: (817) 305.0055 | Cell: (323) 842-8134 | Fax (817) 488-4958
www.southpeakgames.com

"This email is confidential and intended solely for the use of the individual to whom it is addressed. If you have received this email in error please notify postmaster@southpeakgames.com."

"This email is confidential and intended solely for the use of the individual to whom it is addressed. If you have received this email in error please notify postmaster@southpeakgames.com."



February 3, 2009

**VIA FACSIMILE, E-MAIL AND FEDERAL EXPRESS**

Bernie Fischbach
Fischbach, Perlstein & Lieberman LLP
1875 Century Park East, Suite 1450
Los Angeles, CA 90067

   Re: Option to Publish and Distribute Section 8 for the Playstation 3

Dear Mr. Fischbach:

   Pursuant to the June 15, 2007 publishing agreement ("Agreement") by and between Gone Off Deep, LLC ("GOD") and TimeGate Studios, Inc. ("TimeGate"), the purpose of this correspondence is to provide you with formal notice that TimeGate has received a offer from a third-party ("Third Party Publisher") to publish and distribute the Playstation 3 ("PS3") port for *Section 8*. The offer consists of the following terms and will be accepted upon GOD's failure to exercise its option as set forth in the Agreement:

- **Description**: This project is the PS3 port of the XBOX 360 and PC versions of *Section 8*. It also includes a web portal and downloadable content hooks. It does not, however, include any actual downloadable content or platform-exclusive content, although TimeGate remains open to discussion on this topic.
- **Development Schedule**: Release date of Q1 2009 (specific date to be mutually agreed upon)
- **Territory**: World
- **PS3 Development Budget**: Two Million Seven Hundred Thousand Dollars ($2,700,000), paid in equal, monthly installments from execution through delivery of the gold master of the PS3 SKU
- **PS3 Marketing Budget**: To be mutually agreed to at a later time between TimeGate and Third Party Publisher
- **PS3 Total Budget**: Amount equaling the PS3 Development Budget plus the PS3 Marketing Budget
- **PS3 Net Revenue**: Mirrored definition to that of the Agreement, but specific to the PS3 SKU
- **PS3 Cost of Goods Sold**: Mirrored definition to that of the Agreement, but specific to the PS3 SKU
- **Recoupment Model**: 100% of PS3 Net Revenue shall go to Third Party Publisher until full recoupment of the PS3 Total Budget
- **Royalty Split**: Upon full recoupment of the PS3 Total Budget, the royalty split shall be sixty-percent (60%) of PS3 Net Revenue to the Third Party Publisher and forty-percent (40%) of PS3 Net Revenue to TimeGate.

   Accordingly, please notify either myself or Adel Chaveleh within ten (10) days of receiving this correspondence as to whether GOD will be exercising the option provided for in the Agreement.

                                        Very truly yours,

                                        Scott Weiss
                                        Corporate Counsel

Cc: Terry Phillips, Chairman of Southpeak Games

# EXHIBIT "L"

Morrison & Foerster Quarterly News                                    Spring 2010

# Liability for Foreign Copyright Infringement

## By Alistair Maughan and James E. Hough

Ask any business operating overseas to list its main risk concerns and "containing foreign liabilities" is likely to be on that list. U.S. companies operating in Europe, in particular, routinely use corporate structuring devices such as locally-incorporated subsidiaries to make certain that, while profits can be passed up the corporate chain, liabilities remain on the other side of the Atlantic. Allied to this, many U.S. companies take the structuring principle even further and use a subsidiary created under a perceived business-friendly and more predictable legal system such as the United Kingdom to manage all of their activities across Europe.

A further risk mitigation from international IP infringement liability is the "territoriality" principle of international law. This generally accepted principle in Europe and the United States is that a country's laws only have force within its boundaries.

So when it comes to IP, especially copyright infringement, you'd think that overseas businesses operating in the UK (and onward elsewhere into Europe) should be able to isolate themselves from infringement activities conducted outside U.S. borders, right?

Well, no not always. Sometimes, cracks appear in the corporate veil and, as a recent case in the English High Court illustrates, a U.S. business that doesn't take care can find itself taking on unexpected liabilities.

### Absent but still Liable

In the case *CDV Software Entertainment v. Gamecock Media Europe, et al,*[1] a U.S. company in the media industry was surprised to find itself liable for copyright infringement in the UK, even though all activities in the UK had been conducted by its specifically incorporated UK subsidiary.

SouthPeak Interactive, a U.S. company ("SouthPeak U.S."), had established a UK subsidiary (SouthPeak Interactive Limited) to exploit the UK and European market for computer games. SouthPeak found itself sued in the UK based on breach of contract and copyright infringement because it had exploited certain computer games (in the belief that it was entitled to do so) that were in fact exclusively licensed to another company, CDV Software Entertainment.

> STRUCTURING A PARENT-SUBSIDIARY RELATIONSHIP IN A WAY THAT AVOIDS – OR AT LEAST MINIMIZES – VICARIOUS LIABILITY IS ONE OF A NUMBER OF RELEVANT BUSINESS FACTORS THAT MUST BE ASSESSED.

CDV ("SouthPeak UK") – presumably following the money – didn't want to stop at the SouthPeak UK subsidiary; it wanted to establish that SouthPeak U.S., the ultimate parent, was also liable to pay damages for copyright infringement. SouthPeak U.S. did not deny that its UK subsidiary had marketed, licensed, distributed and sold the products in Europe but it did not accept that, merely because its subsidiary had done so, the U.S. parent also incurred the same liability.

Whether or not the U.S. parent was liable turned on the interpretation of the UK Copyright, Designs & Patents Act 1988 which said (in a provision common across Europe) that copyright infringement occurs by anyone who either does "or authorises another to do" any of the acts restricted by the copyright.

SouthPeak argued that the mere existence of a parent/subsidiary relationship is not sufficient to deem the parent to be authorising the subsidiary to undertake specific conduct which may turn out to constitute copyright infringement.

The High Court agreed that the mere existence of a parent/subsidiary relationship is not, on its own, enough for copyright infringement liability to accrue to the parent. But SouthPeak's misfortune was that the court found that, as a result of various actions by the U.S. parent, it not only authorised the infringing activities but it also participated in such actions itself.

### Lessons to be Learned

Where SouthPeak went wrong was to create a separate UK structure but then behave in a way which destroyed the insulating effect of that structure.

The activities which were deemed sufficient to create copyright infringement liability included simply advertising the product on the SouthPeak European website as being published or released by "SouthPeak" as opposed to SouthPeak UK, and failing to distinguish clearly between SouthPeak UK and SouthPeak U.S. in marketing literature and distribution agreements. SouthPeak's on-line literature pointed to SouthPeak U.S., as the holding company of the international group. Even in the court proceedings, the key witnesses for SouthPeak used "SouthPeak" to refer interchangeably at times to both the U.S. and the UK companies.

*(Continued on page 11)*

# Copyright

(Continued from Page 10)

So, SouthPeak's error was to fail clearly to distinguish between parent and subsidiary both in the manner of distribution of the product and the way in which it was marketed. As a result, the court decided to look through the legal structure and examine the reality of the situation by which the products were marketed and the strategy for the promotion and distribution of the product. Having done so, the court found that the U.S. parent was indeed acting with the UK subsidiary in violation of the infringing act. In practice, SouthPeak U.S. failed to have a sufficiently arm's relationship between parent and subsidiary, and so, when things went wrong, it could not rely on the corporate structure to insulate itself from copyright infringement overseas.

## Similar Result Likely Under U.S. Law

SouthPeak U.S. would probably have not fared any better if the case were decided under U.S. law. Like the High Court decision in SouthPeak, U.S. courts do not permit imposition of copyright infringement liability based solely on the legal relationship between a parent corporation and its subsidiary[2]. However, in general, U.S. law permits finding a parent corporation liable for copyright infringement by a subsidiary in situations where "there is a substantial and continuing connection between the two with respect to the infringing act."[3] SouthPeak U.S. seems to have had both a direct financial interest in the infringing activity of its UK subsidiary, and continuing connection to it, sufficient to trigger vicarious liability under U.S. law.

## Conclusion

The case is a salutary lesson for U.S. businesses operating overseas, that simply establishing a particular series of local corporate vehicles may not be enough to

(Continued on page 12)

# Intellectual Property News

## From the Docket

### Major Victory for the Open Source Movement

On March 30, 2010, a jury in federal district court in Salt Lake City, Utah returned a decisive verdict in favor of our client Novell in its seven-year dispute with The SCO Group involving the copyrights for the core UNIX computer operating system. After approximately seven hours of deliberation, the jury found that, contrary to SCO's claims, the UNIX copyrights were not transferred from Novell in a 1995 Asset Purchase Agreement. This factual determination was fatal to SCO's claim that Novell was liable to SCO for between $115 million and $200 million for Novell's alleged slander of SCO's claim to ownership of the UNIX copyrights. A team led by Morrison & Foerster's Michael Jacobs and Eric Acker, and Workman Nydegger's Sterling Brennan represented Novell in the trial and throughout the seven-year dispute.

The case began in 2003 when SCO filed suit against IBM, seeking billions in damages relating to alleged violations of SCO's rights in UNIX, and then sent demand letters to the Fortune 1000 companies alleging that any company's use of the Linux operating system infringed SCO's alleged rights to the UNIX copyrights. In response, Novell publicly challenged SCO's claims, insisting that Novell retained the UNIX copyrights as part of its 1995 deal to sell certain UNIX assets to the Santa Cruz Operation (that subsequently assigned its UNIX rights to SCO). In early 2004, SCO brought a "slander of title" action against Novell in Utah state court. Following removal to federal court, each side filed claims and counterclaims for slander of title, copyright infringement, unfair competition, and breach of contract. At the heart of all

SCO's claims was its alleged ownership of the core UNIX copyrights. The dispute over ownership of the UNIX copyrights, and the *SCO v. Novell* lawsuit, attracted significant attention in the open source community and the software media, including spawning a website (Groklaw) devoted to covering the dispute.

In August 2007, the district court granted summary judgment for Novell, finding that Novell, not SCO, owns the UNIX copyrights. The Wall Street Journal described the ruling as a "boon to the open source software movement that has become an alternative to Microsoft Corporation's Windows operating system." The ruling caused SCO to seek Chapter 11 bankruptcy protection in September 2007.

A bench trial was then held in April 2008 on certain of Novell's counterclaims. In July 2008, the court issued an order in favor of Novell, ruling that SCO must pay Novell roughly $2.5 million (plus interest) in royalty revenue paid to SCO by Sun Microsystems. SCO then appealed to the 10th Circuit, which affirmed the district court's judgment with regard to royalties due Novell, but remanded for trial the question of the ownership of the UNIX copyrights. This resulted in the three-week trial that ended with the March 30, 2010, verdict.

The jury verdict confirms Novell's ownership of the UNIX copyrights and rejects SCO's claim to damages of hundreds of millions of dollars. Novell's press release says: "This decision is good news for Novell, for Linux, and for the open source community." The verdict could also spell the beginning of the end of SCO's effort to extract licensing fees from open source software developers such as IBM, Red Hat, and Sun Microsystems.

(Continued on page 12)

# Copyright

(Continued from page 11)

# IP News

(Continued from page 11)

insulate the U.S. parent from copyright infringement liability incurred overseas. The management and direction of the entire corporate family and the way that the local operations are held out to the public must be sufficient to back-up the parent/subsidiary relationship. An increase in hands-on involvement by the U.S. parent in local operations, which may sometimes be desired to meet business needs, brings with it a commensurate increase in potential exposure to local copyright infringement claims. Structuring a parent-subsidiary relationship in a way that avoids – or at least minimizes – vicarious liability is one of a number of relevant business factors that must be assessed. Unless an appropriate arm's-length relationship is established, the good and careful work done in setting up a particular corporate structure may be destroyed by insufficient care in operation.

1. *CDV Software Entertainment AG v Gamecock Media Europe Ltd & Ors* [2009] EWHC 2965 (Ch), Case No: HC09C00767, High Court of Justice, Chancery, Intellectual Property (20 November 2009).

2. *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1553 (9th Cir. 1989).

3. *Id. quoting Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 50, 519-20 (9th Cir. 1985).

## Awards & Recognitions

The 2010 awards season has started extremely well for our IP attorneys and our practice overall.

*China Law & Practice* ranked Morrison & Foerster's IP Practice as one of the top-tier international firms in the magazine's 2010 China IP Rankings.

The firm's intellectual property group achieved rankings in ten categories in the annual "World IP survey" by *Managing Intellectual Property* (*MIP*). The February 2010 issue, "2010 Patent Firms of the Year," includes the World IP Survey in which the firm is ranked in ten categories, and moved higher in two categories: ITC practice and Patent Contentious (West) for which the firm earned the highest Tier 1 ranking. Our group also received the Tier 1 ranking in Copyright (West). *MIP* also honored Harold McElhinny as one of five finalists for "Top IP Attorney in the U.S."

Mika Mayer, a partner in our Patent Practice, received two honors. *IPLaw360* publications listed her as one of the "Top 10 Under 40" IP attorneys in the U.S. She received a similar designation from the San Francisco and Los Angeles

*Daily Journal*, which listed her as one of California's "Top 20 Under 40" attorneys.

David Doyle was recognized by *United States Lawyer Rankings* as one of the U.S.'s Top 10 Intellectual Property Lawyers.

In March, the San Francisco and Los Angeles *Daily Journal* published its 2010 list of Top 75 IP Litigators and Top 25 Patent Portfolio Managers. Michael Jacobs, Rachel Krevans, and Harold McElhinny were named to the top IP litigators list and Kate Murashige, Catherine Polizzi, and Michael Ward were named to the top patent portfolio managers list.

---

## About Morrison & Foerster's Intellectual Property Practice

Morrison & Foerster maintains one of the largest and most active intellectual property practices in the world. The IP practice provides the full spectrum of IP services, including litigation and alternative dispute resolution, representation in patent and trademark prosecution, and business and licensing transactions. Morrison & Foerster's IP practice has the distinguishing ability to efficiently and effectively handle issues of any complexity involving any technology. For more information about the IP practice, please visit www.mofo.com.

This newsletter addresses recent intellectual property updates. Because of its generality, the information provided herein may not be applicable in all situations and should not be acted upon without specific legal advice based on particular situations. If you wish to change an address, add a subscriber, or comment on this newsletter, please write to: Michael Zwerin at Morrison & Foerster LLP, 425 Market Street, San Francisco, California 94105, or e-mail mzwerin@mofo.com.

©2010 Morrison & Foerster LLP. All Rights Reserved.



Main  Game Monetization  Law  Pre-Owned Market

Search Topics

**Hot:** *Motion Control, Wii, 3-D Stereoscopic*



# Paradox Interactive Suing SouthPeak Over Distribution Deal, Insolvency Concerns

Posted March 19, 2010 by James Brightman

*IndustryGamers* today obtained a court filing detailing Paradox Interactive's lawsuit against SouthPeak Interactive. The suit, filed on March 8, indicates that a distribution agreement between the two companies, which saw SouthPeak act as a non-exclusive distributor of Paradox titles in North America, has gone awry. Ultimately, Paradox claims that SouthPeak has failed to make its payments and concerns over SouthPeak's "insolvency" are making matters worse. Paradox believes that SouthPeak owes the company "at least" $585,382.31.

"SouthPeak has failed to comply with its payment obligations even for game units which it previously reported to Paradox, and SouthPeak's executives have informed Paradox's executives that SouthPeak is currently financially unable to satisfy its payment obligations to Paradox under the Agreement," the filing stated.

With the payments not coming through, Paradox terminated the distribution agreement with SouthPeak on February 22 of this year. Then, in response to the termination notice, Paradox said that SouthPeak Chairman Terry Phillips "threatened that SouthPeak would insist that its retailers return any unsold inventory of Paradox games that were previously distributed." Paradox said that "there is no rational business reason for requesting such returns; it is contrary to the provisions in the Agreement for post-termination handling of product." Furthermore, Paradox said the company would be "irreparably harmed" by SouthPeak's request to retailers to return the unsold games.

Paradox is now looking for an injunction against SouthPeak to prevent them from getting games returned, and Paradox also is looking for a receiver to be appointed to collect the money that it believes SouthPeak owes the company.

SouthPeak's business has been in rough shape of late. The company lost $2.6 million over the holiday period and admitted that its ability to continue business is a "going concern." That said, more recently SouthPeak was able to extend its credit line, so we'll see what the future holds for the beleaguered publisher.

# EXHIBIT "M"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TIMEGATE STUDIOS, INC.,                    §
                                           §
        *Plaintiff,*                       §
                                           §
v.                                         §       CIVIL ACTION NO. 4:09-CV-03958
                                           §
SOUTHPEAK INTERACTIVE CORP.,               §
ET AL,                                     §
                                           §
        *Defendants*                       §

## DECLARATION OF HARRY MILLER

I, Harry Miller, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct and within my personal knowledge:

1. I previously served as president of Gone Off Deep, LLC d/b/a Gamecock Media Group (collectively "Gamecock"), a video game publisher, based in Austin, Texas.

2. In 2007, Gamecock contemplated a business relationship with TimeGate Studios, Inc. ("TimeGate"), a video game developer, regarding their newest project, Section 8.

3. Subsequently, Gamecock and TimeGate entered into the "June 15, 2007 Publishing Agreement for Section 8 by and between Gone Off Deep, LLC and TimeGate Studios, Inc." ("Publishing Agreement"). I executed the Publishing Agreement on behalf of Gamecock.

4. Section 1.6 of the Publishing Agreement sets forth the manner in which "Cost of Goods Sold" was to be allocated between Gamecock and TimeGate. *See* **Exhibit "A"**.

5. Upon reviewing Section 1.6 by itself and in conjunction with the other sections of the Publishing Agreement, it appears that "Cost of Goods Sold" would be determined by the number of Section 8 boxes *actually* sold on a per unit basis.

Executed on this 18 day of January, 2010.

_____
Harry Miller

**1.5 "Confidential Information"** shall mean any and all information disclosed by Developer and GOD, either directly or indirectly, to the other party and which if written is marked as confidential or, if disclosed orally or otherwise, is designated as confidential and confirmed in writing as such within thirty (30) days of such oral or other disclosure.  Notwithstanding the foregoing, all source code disclosed herein shall be deemed Confidential Information, whether marked or indicated as such.  Confidential Information shall include all business, financial, technical and other Intellectual Property information of a party, identities of customers, clients or licensees, proprietary software code, progress of development and any other information whether oral or written which is not generally known or available to the public).

**1.6 "Cost of Goods Sold" or "COGS"** shall mean with respect to the Game (or other products sold pursuant to the terms of this Agreement), the aggregate costs of:

    a. direct manufacturing costs, and Manual costs;
    b. shipping and freight, and in the case of sales resulting in Special OEM Revenues, amounts directly relating to such sales owed to sales person or organization assisting in the OEM sale;
    c. discounts, markdowns;
    d. bad credit, replacements not otherwise recovered from the Reserve Basket;
    e. applicable duties, value-added taxes and other taxes actually incurred by or on behalf of GOD as a result of sale, distribution and/or placement of the Game;
    f. manufacturing license fees due to platform manufacturers (i.e., Sony, Microsoft, Nintendo, etc.) incurred by or on behalf of GOD
    g. Distribution fees paid. For clarification of this section, if the wholesale price is net of distribution fees, then distribution fees will not be added to COGS as Gross Revenue will be based on wholesale price; and
    h. Sales commission fees actually paid to outsourced sales organizations.

**1.7 "Deliverables"** means the binary code for the Game together with Developer's notes, plans, artwork and any other documentation (including (i) the Manual Deliverables as set forth in Article 5.3; and (ii) other deliverables as set forth on the Development Schedule), media or other materials developed by or on behalf of Developer, in conjunction with the Game and which may be necessary or useful to GOD in connection with the Use (as defined herein) of the Game by or on behalf of GOD.

**1.8 "Derivative Work"** means a work that is derived from the Game such that the Use thereof would infringe upon the intellectual property rights in the Game;

**1.9 "Direct Sales"** means sales to consumers made directly from website(s) owned or controlled by GOD or Developer, provided that Developer shall only be entitled to make Direct Sales soley pursuant to Article 2.7(c).

**1.10 "Developer's Cost of Money"** means the sum of Developer's Development Funding and Developer's Initial Investment, the total of which shall be multiplied by .20.

**1.11 "Development Budget"** means Ten Million Dollars ($10,000,000.00 USD).

PUBLISHING AGREEMENT – **Page 2**
Profit share
June 15, 2007

PLAINTIFF'S EXHIBIT "A"