IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIMEGATE STUDIOS, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | C.A. No.  4:09-cv-3958 |
| | § | |
| SOUTHPEAK INTERACTIVE CORP.; | § | |
| SOUTHPEAK INTERACTIVE, LLC; | § | JURY DEMANDED |
| GONE OFF DEEP, LLC D/B/A GAMECOCK | § | |
| MEDIA GROUP AND TERRY M. PHILLIPS, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD

Lynne Liberato
State Bar No. 00000075
Southern District Bar No. 3072
1221 McKinney Street, Suite 2100
Houston, Texas  77010-2007
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
E-mail: lynne.liberato@haynesboone.com

ATTORNEY-IN-CHARGE FOR PLAINTIFF,
TIMEGATE STUDIOS, INC.

OF COUNSEL:

Mark Trachtenberg
State Bar No. 24008169
Southern District Bar No. 24584
Christina Crozier
State Bar No. 24050466
Southern District Bar No. 611402
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 2100
Houston, Texas  77010-2007
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
E-mail: mark.trachtenberg@haynesboone.com

Scott Weiss
Corporate Counsel
State Bar No. 24042134
Southern District Bar No. 38224
14140 Southwest Freeway, Suite 200
Sugar Land, Texas  77478
Telephone: (281) 295-4122
Facsimile: (832) 201-0687
Email: sweiss@timegate.com

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ................................................................................................1

BACKGROUND ..................................................................................................2

A.　　TimeGate spent four years developing a video game called Section 8 ..............................2

B.　　TimeGate entered an Agreement with Gamecock to publish Section 8, which contemplated that the parties would split the cost of developing and rights to profits from the Game ................................................................................2

C.　　The parties' relationship deteriorated once SouthPeak stepped in for Gamecock..............4

D.　　At this Court's direction, the parties proceeded to arbitration, where the arbitrator excluded a critical exhibit ..............................................5

E.　　The arbitrator awarded the SouthPeak Parties $7.35 million in damages that were not permitted under the Agreement and unilaterally amended the Agreement to (1) give TimeGate's intellectual property rights to the SouthPeak Parties, and (2) excuse the SouthPeak Parties from reporting sales or paying royalties to TimeGate................................................................................................6

ARGUMENT AND AUTHORITIES..................................................................7

I.　　The applicable vacatur grounds ..................................................................7

II.　　The arbitrator exceeded his powers by reaching an award that was contrary to the parties' Agreement in multiple respects .........................................8

A.　　The arbitrator exceeded his powers by amending the Agreement to give SouthPeak and Gamecock a perpetual license for TimeGate's intellectual property rights in Section 8 and to strip TimeGate of its royalty interest.................9

1.　　The arbitrator's award was not requested by SouthPeak and violated three separate provisions of the Agreement.................................9

2.　　The arbitrator's award is not sufficiently final .........................11

B.　　The arbitrator exceeded his powers by factoring into his damages calculation $8.29 million in milestone payments ....................................12

C.     The arbitrator exceeded his powers by awarding consequential damages that were prohibited by Article 15 of the Agreement ..............................................14

1.     All of SouthPeak's sales-related expenses were consequential damages that were barred by the Agreement ..............................................15

2.     All of the milestone payments were consequential damages that were barred by the Agreement ..................................................17

D.     The arbitrator's award fails the "essence test"......................................................18

III.   The arbitrator exceeded his authority by issuing an award without reference to any recognized basis for measuring damages under Texas law ..................................................18

IV.    By belatedly refusing to consider TimeGate's only evidence showing its monetary contributions to Section 8, the arbitrator failed to give TimeGate an adequate opportunity to present its case..............................................................20

A.     The arbitrator led TimeGate to believe that its key exhibit had been admitted and then changed his mind after the hearing ..........................................21

B.     By striking TimeGate's key exhibit after the hearing, the arbitrator prevented TimeGate from presenting material evidence ......................................22

CONCLUSION AND PRAYER ..............................................................................24

CERTIFICATE OF SERVICE ..............................................................................26

EXHIBITS ............................................................................................ Tabs 1 - 15

# TABLE OF AUTHORITIES

### CASES

*Advanced Micro Devices, Inc. v. Intel Corp.,*
9 Cal. 4th 362, 36 Cal. Rptr. 2d 581 (1994)...............................................................10

*Alvarado v. Wells Fargo Advisors, LLC,*
No. 10-0362, 2011 WL 677354 (S.D. Tex. Feb. 15, 2011).........................................12

*Arthur Andersen v. Perry Equip. Corp.,*
945 S.W.2d 812 (Tex. 1997).......................................................................................14

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,*
345 F.3d 347 (5th Cir. 2003) .........................................................................................8

*CCE, Inc. v. PBS&J Constr. Servs., Inc.,*
No. 01-09-00040-CV, 2011 Tex. App. LEXIS 809
(Tex. App.—Houston [1st Dist.] Jan. 28, 2011, pet. denied) .....................................14

*Courier-Citizen Co. v. Boston Electrotypers Union No. 11,*
702 F.2d 273 (1st Cir. 1983).......................................................................................10

*Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n,*
889 F.2d 599 (5th Cir. 1989) .........................................................................................8

*Ergobilt, Inc. v. Neutral Posture Ergonomics, Inc.,*
2002 WL 1489521 (N.D. Tex. 2002)..........................................................................10

*Executone Info. Sys., Inc. v. Davis,*
26 F.3d 1314 (5th Cir. 1994) ...........................................................................7, 11, 18

*Fahnestock & Co., Inc. v. Waltman,*
935 F.2d 512 (2d Cir. 1991)........................................................................................10

*Foley v. Parlier,*
68 S.W.3d 870 (Tex. App.—Fort Worth 2002, no pet.)..............................................20

*Gulf Coast Indus. Workers Union v. Exxon Co., USA,*
70 F.3d 847 (5th Cir. 1995) ...........................................................................21, 22, 23

*Hart v. Moore,*
952 S.W.2d. 90 (Tex. App—Amarillo 1997, pet. denied)....................................14, 19

*Hoteles Condado Beach v. Union De Tronquistas Local 901*,
763 F.2d 34 (1st Cir. 1985) ......................................................................... 20

*Houston Lighting & Power Co. v. Int'l Brotherhood of Elec. Workers*,
71 F.3d 179 (5th Cir. 1995) ......................................................................... 11

*Int'l Talent Group, Inc. v. Copyright Mgmt., Inc.*,
769 S.W.2d 217 (Tenn. Ct. App. 1988) ...................................................... 15

*Lummas Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*,
256 F. Supp. 2d 594 (S.D. Tex. 2002) ......................................................... 12

*O'Flaherty v. Belgum*,
115 Cal. App. 4th 1044, 9 Cal. Rptr. 3d 286 (2004)................................... 10

*Peacock v. Wave Tec Pools, Inc.*,
107 S.W.3d 28 (Tex. App.—Waco 2003, no pet.)....................................... 15

*Piggly Wiggly Operator's Warehouse, Inc. v. Piggly Wiggly Operator's
Warehouse Indep. Truck Driver's Union Local No. 1.*,
611 F.2d 580 (5th Cir. 1980) ...................................................................... 10

*Popcap Games, Inc. v. MumboJumbo, LLC*,
No. 05-10-00301-CV, 2011 Tex. App. LEXIS 7122
(Tex. App.—Dallas Aug. 31, 2011, no pet. h.) ........................................... 17

*Roadway Package Sys., Inc. v. Kayser*,
257 F.3d 287 (3d Cir. 2001)........................................................................ 10

*Ryan Energy Techs. v. CDG-MWD GP, L.L.C.*,
2006 WL 213916 (S.D. Tex. Jan. 27, 2006) ............................................... 10

*Sobel v. Jenkins*,
477 S.W.2d 863 (Tex. 1972) ....................................................................... 20

*Stolt-Neilsen SA v. Animalfeeds Int'l Corp.*,
130 S. Ct. 1758 (2010) .......................................................................... 18, 19

*Tempo Shain Corp. v. Bertek, Inc.*,
120 F.3d 16 (2d Cir. 1997) ......................................................................... 20

*Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*,
607 F.2d 649 (5th Cir. 1979) ...................................................................... 10

**S**TATUTES

9 U.S.C. § 10(a)(3).................................................................................... 8, 20

9 U.S.C. § 10(a)(4)............................................................................. 8, 11, 12, 18

TO THE HONORABLE JUDGE ELLISON:

Plaintiff, TimeGate Studios, Inc. ("TimeGate"), respectfully files this Motion to Vacate Arbitration Award. TimeGate requests that the Court grant its motion to vacate the arbitration award and deny the Motion for Entry of Final Judgment Confirming Arbitration Award filed by Defendants SouthPeak Interactive Corp. ("SIC"), SouthPeak Interactive, LLC ("SouthPeak"), Gone Off Deep, LLC d/b/a Gamecock Media Group ("Gamecock") and Terry Philips (collectively, the "SouthPeak Parties") (Doc. # 152).

## INTRODUCTION

The arbitrator in this case issued a fundamentally flawed award that violates the very contract that empowered him to decide this dispute. Although an arbitrator has considerable discretion, the Federal Arbitration Act ensures that there are limits on his authority. He cannot grant relief that the parties never requested and that was not implicated by any of the claims submitted in the proceeding. He cannot grant relief that was expressly prohibited by the contract from which he derives his authority. And he cannot refuse to consider material evidence critical to the dispute. The arbitrator violated each of these tenets.

The arbitrator turned this simple case upside-down, determined that the counterclaims asserted by the SouthPeak Parties were meritorious and entered an award against TimeGate in excess of $7.35 million. The award went on to give the SouthPeak Parties even more relief than they requested by stripping TimeGate of its intellectual property and giving them a "perpetual license" to the Section 8 video game. Additionally, the award gave the SouthPeak Parties a windfall recovery by allowing them to recoup their entire investment and keep all profits without paying any royalties to TimeGate, in violation of the express terms of the parties' contract. As a result, TimeGate's future is in disarray. It has nothing to show for a game that it spent millions

of dollars and years of labor developing – a game that the SouthPeak Parties previously referred to as one of their highest revenue-generating titles.  (*See* Exhibit 1 at 2.)

Because there is no rational way to explain the arbitrator's award as a logical means of furthering the aims of the contract, it must be vacated for the reasons set forth below.

## BACKGROUND

**A.    TimeGate spent four years developing a video game called Section 8.**

TimeGate has been developing video games for more than a decade, and its games have won numerous awards, including multiple "game of the year" awards.  (Exhibit 2 at 45.)  In 2005, TimeGate began developing Section 8®, a highly intense, interactive video game ("Section 8" or the "Game").  (Exhibit 2 at 48.)  TimeGate developed the Game over the course of four years, with the work of many employees.  (Exhibit 2 at 51-52.)

Initially, Section 8 was funded and staffed entirely by TimeGate.  (Exhibit 2 at 52.) However, TimeGate decided that it needed to find a publisher for Section 8 to bring the Game to market, so it began discussions with Gamecock.  (Exhibit 2 at 51, 53, 57.)

**B.    TimeGate entered an Agreement with Gamecock to publish Section 8, which contemplated that the parties would split the cost of developing and rights to profits from the Game.**

On June 15, 2007, TimeGate and Gamecock executed a Publishing Agreement for Section 8.  (Exhibit 3 (hereinafter "Agreement").)  The Agreement was unlike the typical "work for hire" gaming contract in which the publisher would finance the entire project, own the intellectual property in the Game and retain all of the revenue generated from sales.  Instead, this Agreement was unique in that TimeGate was required to contribute millions of dollars of its own money, but retained the intellectual property rights in the Game. (Exhibit 2 at 72.)   The Agreement also provided that TimeGate would receive milestone payments, recoup its initial

investment and share in the revenue generated from sales of the Game, as the phrase "profit share" appears on the bottom of each page of the Agreement.   (Exhibit 3.)

TimeGate and Gamecock estimated that Section 8 would cost $10 million to develop. (Exhibit 2 at 67.)  Under the Agreement, TimeGate was required to spend $2.5 million towards development, with Gamecock to provide $7.5 million in "Publisher's Development Funding," i.e., milestone payments for work that TimeGate submitted to Gamecock and that Gamecock approved, as set forth in the exhibit to the Agreement.[1]  These payments were addressed in Article 1.33 of the Agreement, which defines Publisher's Development Funding as "*a recoupable, non-refundable amount* of Seven Million Five Hundred Thousand Dollars ($7,500,000.00 USD)."  (Exhibit 3 at Art. 1.33.)  In other words, Gamecock could recoup its $7.5 million investment from sales of the Game, as reflected in Article 6.2(a) of the Agreement, but TimeGate was under no obligation to refund the milestone payments once the deliverables had been submitted to and approved by Gamecock.

While the milestone payments compensated TimeGate for its development work on the Game, Article 6.2 of the Agreement provided TimeGate with the ability to recover its own initial financial investment and receive additional revenue generated from sales of the Game.  (Exhibit 3 at Art. 6.2; Exhibit 2 at 112.)  The distribution of net revenue was to be made first to recoup the $10 million in developing funding provided by TimeGate and Gamecock in proportion to their respective investments, and then according to additional formulas set out in the Agreement. (Exhibit 3 at Art. 6.2(a); Exhibit 2 at 116.)

Given that TimeGate began developing the Game over two years before entering into the Agreement and owned the trademark and copyright registrations, the parties fully intended for

---

[1]    First, Gamecock was to pay TimeGate for 31 separate "milestone payments" (later modified to 39) for work that TimeGate completed *and* that Gamecock *approved*.  (Exhibit 3 at Arts. 1.14, 1.20, 3.1-3.6 & Ex. C; Exhibit 2 at 112-13.)

TimeGate to retain all of its intellectual property rights as expressed in the Agreement.  (Exhibit 3 at Art. 9.1a.)  While the ownership rights remained with TimeGate, Gamecock obtained a license during the limited term of the Agreement "to, in object code form, on its behalf or at its direction, reproduce, manufacture, package, advertise, publish, market, sell . . . and display . . . the Game . . . "  (Exhibit 3 at Art. 2.1.)

TimeGate and Gamecock also mutually agreed to limit their respective liability under Article 15 of the Agreement, which provided that:

> IN NO EVENT SHALL EITHER PATY BE LIABLE TO THE OTHER PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR ANY LOSS OF PROFIT OR ANY OTHER COMMERCIAL DAMAGE INCLUDING, WITHOUT LIMITATION, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE, OR OTHER INDIRECT DAMAGES OF ANY NATURE, FOR ANY REASON WHATSOEVER INCLUDING WITHOUT LIMITATION, EITHER PARTY'S BREACH OF THIS AGREEMENT . . . WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT . . . OR OTHERWISE . . . .

(Exhibit 3 at Art. 15.)

Finally, because the Agreement had been fully negotiated and agreed to by both parties, the parties included a provision that "This Agreement may only be changed by written amendment signed both parties or by their duly authorized agents having authority equal to, or higher than, that of the signatories to the Original Agreement."  (Exhibit 3 at Art. 20.10.)

## C.     The parties' relationship deteriorated once SouthPeak stepped in for Gamecock.

In October 2008, Gamecock was acquired by SouthPeak, which assumed the rights and responsibilities of the "Publisher" under the Agreement.  (Exhibit 2 at 147.)  After TimeGate had submitted its final milestone and delivered the "GoldMaster" version of the Game, SouthPeak released it to the market in late 2009.  (Exhibit 2 at 1296-99.)

Shortly thereafter, TimeGate learned that SouthPeak was misreporting sales figures to prevent TimeGate from receiving the return of its initial investment and its share of the revenue.

(Exhibit 2 at 165, 169.)  Despite the fact that SouthPeak had received over $13 million from sales of the Game, SouthPeak withheld all revenue from TimeGate in violation of Article 6.2(a) of the Agreement.   (Exhibit 2 at 236, 607-08.)   Consequently, TimeGate terminated the Agreement and filed suit for breach of contract.  (Exhibit 2 at 234.)

**D.      At this Court's direction, the parties proceeded to arbitration, where the arbitrator excluded a critical exhibit.**

After suit was filed, this Court ordered the matter to arbitration.   In the arbitration proceedings, the SouthPeak Parties filed counterclaims for breach of contract and fraudulent inducement.  (Exhibit 4.)  For the first time, the SouthPeak Parties claimed that TimeGate had not only failed to invest its own $2.5 million into the Game, but that it had somehow breached the Agreement despite the fact that all milestones had been approved, the GoldMaster had been accepted and the Game had been commercially released.

To rebut this allegation, TimeGate introduced Exhibit 89—the affidavit of Joseph Gallegos, Chief Financial Officer of TimeGate, which reflected that in conjunction with the $7.5 million in milestone payments received from Gamecock/SouthPeak, TimeGate had spent $11,609,697.16 on the development of Section 8, of which over $3 million was TimeGate's own money. (Exhibit 5 (*filed under seal*); Exhibit 2 at 66-67.)  Attached to Gallegos' affidavit were over 500 pages of backup documentation consisting of itemized expenses that TimeGate was permitted to include as part of its development spending.  (Exhibit 5.)

The SouthPeak Parties did not contest the legitimacy of TimeGate's itemized expenses in Exhibit 89. (Exhibit 2 at 1717-18, 1724-25.)  Rather, they complained about the timing of the production of the exhibit, alleged that an earlier iteration had been produced with different documents and filed a meritless motion for sanctions requesting that Exhibit 89 be stricken from the record.   Despite the SouthPeak Parties' opposition, the arbitrator gave every indication

during the hearing that TimeGate's Exhibit 89 had been admitted and would be considered by him.  This was further implied when the arbitrator later denied SouthPeak's motion for sanctions. (Exhibit 6.)

After all post-hearing briefs had been filed, and two months after the arbitration hearing concluded, the arbitrator informed the parties via email that he admitted all exhibits presented to him except for TimeGate's Exhibit 89.[2]  Specifically, without any explanation, the arbitrator's email stated that "Before me are Claimant's Exhibits 1 through 108, except the claims concerning Exhibit 89, and Respondents Exhibits 1 through 146 . . . .  It matters not to me if you asked any witnesses any questions regarding these Exhibits, I admitted them all except 89." (Exhibit 7.)

**E.    The arbitrator awarded the SouthPeak Parties $7.35 million in damages that were not permitted under the Agreement and unilaterally amended the Agreement to (1) give TimeGate's intellectual property rights to the SouthPeak Parties, and (2) excuse the SouthPeak Parties from reporting sales or paying royalties to TimeGate.**

On October 3, 2011, the arbitrator issued his award denying all of TimeGate's claims and granting the SouthPeak Parties' counterclaims for breach of contract and fraud in the inducement. As a result, the arbitrator awarded what he called "reliance damages" in the amount of $7,349,733.57, which were comprised of an award of $4,223,920.00 to Gamecock and $3,125,813.57 to SouthPeak, plus prejudgment and post-judgment interest, attorneys' fees, and other costs and expenses.  (Exhibit 10 at 14.)  However, as set forth in Parts II.B and II.C below, these damages are strictly prohibited under the Agreement.

Additionally, the arbitrator unilaterally amended the Agreement to give SouthPeak and Gamecock a "perpetual license" to Section 8, even though the Agreement had a limited term and did not contemplate creating irrevocable rights in favor of a licensee.   (Exhibit 10 at 12, ¶¶ 15,

---

[2]    TimeGate's Post-Hearing briefs are attached as 9 and 15.

17; Exhibit 3 at Arts. 9.1(a), 17.1.)  The arbitrator also unilaterally amended the Agreement by excusing the SouthPeak Parties from any obligation to report sales of Section 8 to TimeGate or to pay any future royalties from those sales to TimeGate.  He made this finding despite the fact that the SouthPeak Parties never requested this relief in their live pleadings, at the arbitration hearing, in their post-hearing briefing, or even in the form of the proposed order they submitted to the arbitrator.

The arbitrator's award of damages to SouthPeak and Gamecock would leave them completely "in the black" on Section 8 as of June 30, 2011, taking into account the $13.4 million in revenues from sales of the Game.  (Exhibit 11.)  Yet – with a perpetual license and no royalty obligation – SouthPeak would still be able to continue to reap a 100% profit on all sales of Section 8 from June 30, 2011 forward.  Meanwhile, TimeGate, which spent years developing the Game, is left with absolutely nothing.

## ARGUMENT AND AUTHORITIES

### I.      The applicable vacatur grounds.

Under 9 U.S.C. § 10(a)(4), a court must vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

An arbitrator exceeds his powers under 9 U.S.C. § 10(a)(4) when his award does not "draw its essence" from the contract.  *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1324 (5th Cir. 1994). To determine whether an award meets this "essence test," courts ask "whether the award, however arrived at, is rationally inferable from the contract." *Id.* at 1325.  Vacatur is proper if "there is no rational way to explain the remedy handed down by the arbitrator as a logical means of furthering the aims of the contract." *Id.*  It is well-settled that, as a general proposition, arbitral action contrary to express contractual provisions is not entitled to deference

upon review. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 365 (5th Cir. 2003); *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n,* 889 F.2d 599, 602 (5th Cir. 1989).

Similarly, under 9 U.S.C. § 10(a)(3), a court must vacate an arbitration award if "the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of the party have been prejudiced."

As set forth below, the arbitrator's award is subject to vacatur under both of these provisions.

## II.    The arbitrator exceeded his powers by reaching an award that was contrary to the parties' Agreement in multiple respects.

The arbitrator's award cannot be reconciled with several express provisions in the Agreement.  *First*, the Agreement stated that TimeGate "shall be the owner of all intellectual property rights in the Game," and was entitled to royalties out of net revenues, yet the arbitrator unilaterally amended the Agreement to give SouthPeak and Gamecock a perpetual license for TimeGate's intellectual property and extinguish TimeGate's royalty interest.  (Exhibit 3 at Arts. 6.2(a), 9.1(a); Exhibit 10 at 12, ¶¶ 15, 17.)  *Second*, the Agreement stated that the milestone payments that SouthPeak and Gamecock paid to TimeGate were "non-refundable" (Exhibit 3 at Art. 1.33), yet the arbitrator awarded these payments as part of the SouthPeak Parties' damages. *Third*, the Agreement's Limitation of Liability prohibited consequential damages, but the arbitrator awarded substantial consequential damages to SouthPeak.  (Exhibit 3 at Art. 15.)  As a result, the arbitrator's award was not rationally inferable from the Agreement, and the award should be vacated under 9 U.S.C. § 10(a)(4).

**A.      The arbitrator exceeded his powers by amending the Agreement to give SouthPeak and Gamecock a perpetual license for TimeGate's intellectual property rights in Section 8 and to strip TimeGate of its royalty interest.**

**1.      The arbitrator's award was not requested by SouthPeak and violated three separate provisions of the Agreement.**

The arbitrator's most egregious departure from the express terms of the Agreement was his unilateral award to SouthPeak and Gamecock of a "perpetual license" to Section 8, while excusing them from paying royalties to TimeGate.  Specifically, in rendering his award, the arbitrator signed the exact form of the Final Award, Findings of Fact, and Conclusions of Law submitted by the SouthPeak Parties, except that he added the following conclusions of law on his own initiative:

> 15.      The Publishing Agreement is hereby amended as a matter of law that *Gamecock and SIL [SouthPeak] have a perpetual license for TimeGate's intellectual property* in the Game, and Gamecock and SIL have no obligation to report to TimeGate about sales of the Game that use any of TimeGate's intellectual property, *nor do Gamecock and SIL have any legal obligation to pay any royalties to TimeGate* under the publishing Agreement, and Gamecock and SIL may create Sequels, Ports, Add-Ons related to the Game.
>
> 16.      The Publishing Agreement is hereby amended as a matter of law that TimeGate may create Sequels, Ports, Add-Ons related to the Game or other competing products, and effective the date of this Award the Publishing Agreement is hereby amended that TimeGate has no legal duty to pay any royalties to Gamecock and SIL related to the Game.
>
> 17.      The Publishing Agreement is hereby amended as a matter of law that Gamecock or SIL may create Sequels, Ports, Add-Ons related to the Game or other competing products, and effective the date of this Award the Publishing Agreement is hereby amended that *neither Gamecock nor SIL has no [sic] legal duty to pay any royalties to TimeGate related to the Game*.

(*See* Exhibit 10 at 12 (emphasis added); *compare with* Exhibit 12 at 12.)

The SouthPeak Parties' live pleadings did not request, and none of its claims implicate, the foregoing relief.  (*See* generally Exhibit 4.)  The SouthPeak Parties never asked for this relief during the arbitration hearings.  Nor did the SouthPeak Parties request this relief in their post-

hearing briefing.  To the contrary, as noted above, the arbitrator inserted these provisions into the SouthPeak Parties' proposed form of award on his own initiative.

It is well-established that the scope of an arbitrator's authority is limited to the issues submitted by the parties to the arbitration.  *See Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.,* 607 F.2d 649, 651 (5th Cir. 1979) ("Although arbitrators enjoy a broad grant of authority to fashion remedies, arbitrators are restricted to those issues submitted.")[3]; *see also Piggly Wiggly Operator's Warehouse, Inc. v. Piggly Wiggly Operator's Warehouse Indep. Truck Driver's Union Local No. 1.*, 611 F.2d 580, 583 (5th Cir. 1980) (explaining "[t]he scope of an arbitrator's authority ... is not always controlled by the [arbitration agreement] alone" and the parties "define the issue" to be submitted to the arbitrator); *Ryan Energy Techs. v. CDG-MWD GP, L.L.C.*, 2006 WL 213916, at *2 (S.D. Tex. Jan. 27, 2006); *Ergobilt, Inc. v. Neutral Posture Ergonomics, Inc.*, 2002 WL 1489521, at *8 (N.D. Tex. July 9, 2002).[4]  The arbitrator here violated this fundamental principle of arbitration.

The arbitrator's unilateral award also violated three separate provisions of the Agreement. It violated Article 20.10 of the Agreement, which provides that the Agreement "may only be changed by written amendment signed by both parties . . . ."  (Exhibit 3 at Art. 20.10.)   It

---

[3]    In *Totem Marine*, the plaintiff did not list damages for "charter hire" in its itemized statement of damages, and later conceded that damages for "charter hire" were not an issue in the arbitration. *Totem Marine*, 607 F.2d at 651. The arbitration panel, nevertheless, awarded damages for charter hire, stating "[Plaintiff] erroneously asked only for its return expenses ... in damages.  The proper measure of [plaintiff's] damages was [charter hire damages]."  *Id.* at 650.  The Fifth Circuit vacated the award, finding it "anomalous for the arbitration panel to award an unrequested item of damages three times larger than any item claimed by [Plaintiff]." *Id.* at 651.  The holding in *Totem Marine* controls the result here.

[4]    *See also Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 289 (3d Cir. 2001); *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 515 (2d Cir. 1991) ("[I]f arbitrators 'rule[] on issues not presented to [them] by the parties, [they have] exceeded [their] authority and the award must be vacated.'"); *Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 281 (1st Cir. 1983); *Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal. 4th 362, 382, 36 Cal. Rptr. 2d 581 (1994) (citing *Totem Marine*) ("Even where the parties' original contract included a broad arbitration clause, the arbitrator's powers may be restricted by the limitation of issues submitted."); *O'Flaherty v. Belgum*, 115 Cal. App. 4th 1044, 1055-56, 9 Cal. Rptr. 3d 286 (2004) ("'[a]n [a]rbitrator exceeds his powers when he ... decides an issue that was not submitted'").

contradicts Article 9.1 of the Agreement, which states that TimeGate "shall be the owner of all intellectual property rights in the Game." (Exhibit 3 at Art. 9.1.)  Further, by giving SouthPeak a "*perpetual* license" to the Game, the award contradicts Article 17.1 of the Agreement, which limited the duration of the Agreement (and thus limited the duration of SouthPeak's license to use TimeGate's intellectual property). (Exhibit 3 at Art. 17.1.)  The arbitrator did not have the power to re-write the parties' agreement.  "If the language of the agreement is clear and unequivocal, an arbitrator is not free to change its meaning." *Houston Lighting & Power Co. v. Int'l Brotherhood of Elec. Workers*, 71 F.3d 179, 184 (5th Cir. 1995); *see also Executone*, 26 F.3d at 1325 ("'[A]rbitral action contrary to express contractual provisions will not be respected' on judicial review.").

The arbitrator's unilateral amendment of the Agreement to extinguish TimeGate's intellectual property rights in Section 8 and to strip TimeGate of its right to royalties is inextricably intertwined with – and taints – the entire arbitration award.  A perpetual license gives the SouthPeak Parties the ability to earn and receive all future revenue from sales of the Game without ever having to pay for the license, violating the fundamental purpose of a licensing agreement.  As a result, the award must be vacated.  Further, this relief, when combined with the damages award, would leave SouthPeak completely "in the black," allowing it to reap 100% of the profits on TimeGate's intellectual property going forward.  TimeGate is left with nothing to show for its years of labor, its extensive investment in the development of the Game, and its right to its share of profits from the Game.

### 2.    The arbitrator's award is not sufficiently final.

The arbitrator's hasty amendment to the contract creates a new set of problems, and is a potential source of future litigation.  Under 9 U.S.C. § 10(a)(4), a court must vacate an award where the arbitrator "so imperfectly executed [his powers] that a mutual, final, and definite

award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  A final and definite arbitration award must resolve all issues submitted to arbitration and determine each issue fully so that no further litigation is necessary to finalize the obligations of the parties under the award.  *Lummas Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F. Supp. 2d 594, 349 (S.D. Tex. 2002); *see also Alvarado v. Wells Fargo Advisors, LLC*, No. 10-0362, 2011 WL 677354, at *2 (S.D. Tex. Feb. 15, 2011).

Here, the arbitrator's conclusions of law gave both TimeGate and the SouthPeak Parties the right to create sequels, ports,[5] and add-ons[6] to the Game.  (Exhibit 10 at 12, ¶¶ 16, 17.) However, it is impossible for two different parties to create ports and add-ons to the same Game and there would be no incentive for TimeGate to do so given that the SouthPeak Parties, as "Publisher," would receive all revenue from sales of the Game.  The arbitrator's assignment of the right to create sequels, ports, and add-ons to both parties is unworkable and is a potential source of future litigation.  Accordingly, the award must be vacated under 9 U.S.C. § 10(a)(4).[7]

**B.     The arbitrator exceeded his powers by factoring into his damages calculation $8.29 million in milestone payments.**

The arbitrator's award was directly contrary to the Agreement in another respect.  The Agreement specifically prohibited SouthPeak and Gamecock from recovering the milestone payments that they paid to TimeGate, but the arbitrator nevertheless awarded SouthPeak and Gamecock these "non-refundable" payments as damages.

---

[5]     A "port" is a modification of the game so that it will run on a different gaming platform.

[6]     An "add-on" adds new features to an existing game.

[7]     The arbitrator's order allowing Gamecock and SouthPeak to create Sequels, Ports, Add-Ons related to the Game without paying royalties to TimeGate also violated Article 10.1(c) of the Agreement.  (Exhibit 3 at Art. 10.1(c) ("If [Gamecock] develops or has developed an Add-on, Port or Sequel pursuant to this Agreement, [TimeGate] shall be entitled to a Fifteen percent (15%) royalty of such product's Net Revenue.")

The arbitrator's damages award was based on the testimony of SouthPeak's accountant, James Huyck, whose model was summarized in Respondents' Exhibit 143.[8]   (Exhibit 11.) Huyck started by taking the total of $13,384,296.43 that Section 9 had generated in sales revenue through June 30, 2011, and subtracted out:

- $8,290,000 in what Huyck called "Royalties" in Exhibit 143, but which Huyck admitted were SouthPeak's and Gamecock's combined milestone payments to TimeGate, and which constituted "Publishers' Development Funding" under Article 1.33 of the Agreement (Exhibit 2 at 656, 675); and

- a total of $12,443,030.03 in various deductions, allowances and expenses – primarily negotiated with third parties.[9]

(Exhibit 2 at 651-55, 671-75; Exhibit 11.)  Based on this math, Huyck concluded that SouthPeak had suffered $7,348,733.57 in losses under GAAP.  (Exhibit 11; Exhibit 2 at 608, 1531.)

The SouthPeak Parties' inclusion of the $8,290,000 in milestone payments in their damages model (the model adopted by the arbitrator) was in violation of Article 1.33 of the Agreement.   That provision states that these milestone payments were intended to be a "recoupable, **_non-refundable_** amount."   (Exhibit 3 at Art. 1.33 (emphasis added).)   In other words, the milestone payments were to be recouped from the revenue received from sales of the Game as set forth under Article 6.2(a) of the Agreement, but TimeGate was not responsible for refunding milestone payments provided that Gamecock/SouthPeak accepted all of the milestone submissions for the Game.   (Exhibit 3 at Arts. 1.14, 1.20, 3.1-3.6, and 18.2.)  Huyck even admitted that these milestone payments should not be deducted from net revenues. (Exhibit 2 at

---

[8]   The arbitrator awarded exactly $1000 more than the amount the SouthPeak Parties requested in their Post-Hearing Brief, and the amount of damages that Huyck testified they incurred.  (Exhibit 8 at 32; Exhibit 2 at 1529-31; Exhibit 11.)  The difference was likely the result of a transcription error.

[9]   These deductions and expenses included: "$3,463,331.55 in price protections, $1,055,733.50 in merchandise returns, and $36,149.20 in defective merchandise allowance, . . . $164,238.14 in trade discounts; . . . $3,978,883.10 in manufacturing and testing expenses; . . . $2,268,894.99 in marketing expenses, and $535,180.11 in market development expenses; and . . . $155,589.38 in warehouse and distribution expenses through June 30,2011." (Exhibit 8 at 32.)

675.)   SouthPeak did accept all of the milestone payments, and they were therefore non-refundable.[10]   Therefore, for this additional reason, the award was not rationally inferable from the Agreement.

> ### C.     The arbitrator exceeded his powers by awarding consequential damages that were prohibited by Article 15 of the Agreement.

The arbitrator also exceeded his powers by awarding consequential damages in violation the Agreement's "Limitation of Liability" provision.[11]   This provision prohibits the award of consequential damages or any other kind of indirect damages:

> IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR ANY LOSS OF PROFIT OR ANY OTHER COMMERCIAL DAMAGE INCLUDING, WITHOUT LIMITATION, INCIDENTAL, **CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE OR OTHER INDIRECT DAMAGES OF ANY NATURE FOR ANY REASON WHATSOEVER** . . . .

(Exhibit 3 at Art. 15 (emphasis added).)

Consequential damages (also called "special damages") repay losses that flow naturally, but not necessarily, from the defendant's breach.   *See Arthur Andersen v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997).   They must be foreseeable and directly traceable to the wrongful act.   *Id.*   Unlike consequential damages, direct damages represent compensation for losses that naturally and necessarily result from a breach of contract.   *Id.*   Direct damages compensate the plaintiff for the loss or injury that is conclusively presumed to have been foreseen by the defendant as a consequence of the wrongful act.   *Id.*

---

[10]   Had the arbitrator omitted the milestone payments from his calculation, as he should have, the net revenue from Section 8 would have been positive.

[11]   The fact that the arbitrator labeled his damages award as "reliance damages" – a conclusion challenged *infra* in Part III – does not change the analysis. (Exhibit 10 at 14, ¶ 24.)   Even assuming that these costs were reliance damages, under Texas law, reliance damages may be either direct or consequential.   *See CCE, Inc. v. PBS&J Constr. Servs., Inc.*, No. 01-09-00040-CV, 2011 Tex. App. LEXIS 809, at *21 (Tex. App.—Houston [1st Dist.] Jan. 28, 2011, pet. denied); *Hart v. Moore*, 952 S.W.2d 90, 97 (Tex. App—Amarillo 1997, pet. denied). Because these expenses do not flow from the alleged breach, they cannot be direct damages.   If anything, they were consequential damages, which are barred by the Limitation of Liability in the Agreement.

Here, in addition to the milestone payments discussed above, Huyck also deducted from gross revenue a number of expenses and deductions that were negotiated with third parties without TimeGate's involvement.   These expenses and deductions were summarized by SouthPeak as follows:

> Jim Huyck, the primary accountant for Respondents, testified that Respondents …
> were liable to vendors for $3,463,331.55 in price protections, $1,055,733.50 in
> merchandise returns, and $36,149.20 in defective merchandise allowance, had
> provided $164,238.14 in trade discounts; had incurred $3,978,883.10 in
> manufacturing and testing expenses; had incurred $2,268,894.99 in marketing
> expenses, and $535,180.11 in market development expenses; and had incurred
> $155,589.38 in warehouse and distribution expenses through June 30, 2011.

(Exhibit 8 at 32.)   None of the expenses were a natural or foreseeable consequence of the alleged breach, and therefore could not have been direct damages.

The arbitrator exceeded his powers by awarding these consequential damages, in violation of the Agreement.   *See, e.g., Int'l Talent Group, Inc. v. Copyright Mgmt., Inc.*, 769 S.W.2d 217, 219-20 (Tenn. Ct. App. 1988) (where parties to software agreement agreed to clause limiting liability for "incidental, special or consequential" damages and capped the licensor's liability at $7500, the arbitrators' award of $76,400 was properly vacated under the "exceed their powers" prong); *Peacock v. Wave Tec Pools, Inc.*, 107 S.W.3d 631, 638-39 (Tex. App.—Waco 2003, no pet.) (arbitrator exceeded his authority by ordering a remedy outside the specific remedies contemplated in the arbitration agreement).

### 1.     All of SouthPeak's sales-related expenses were consequential damages that were barred by the Agreement.

First, the sales-related expenses that the arbitrator deducted from sales revenues could not have been direct damages.   These were all expenses that SouthPeak incurred after TimeGate provided it with the "GoldMaster" and after TimeGate's obligations under the Agreement had

been fulfilled.   The following chart explains nature of these damages as testified to by Jim

Huyck, the SouthPeak Parties' Chief Accounting Officer:

| Damages Awarded by the Arbitrator | Huyck's Testimony | Amount |
|---|---|---|
| Price protection | "It's a discount we'll give to a customer such as Walmart if they've had inventory on their shelves for a certain period of time and they'll ask for a markdown to bring it say from 49.99 to 39.99 and they'll pass that through to us." (Ex. 2 at 584.) "Markdowns taken by the customer when they want to reduce the retail price of a game on their shelves and they pass that expense through to us." (Ex. 2 at 585.) | $3,463,331.55 |
| Returns | "[A] return is just return the units to us.  They don't even try to mark them down."  These are "negotiated with each customer." (Ex. 2 at 586-87.) | $1,055,733.50 |
| Merchant Allowances | "Just an allowance with certain customers. Like Walmart gets a 2 percent discount that they take off the invoice, which is a standard discount which would be listed out in each agreement with each customer." (Ex. 2 at 587.)  This "varies with each customer." (Ex. 2 at 588.) | $785,030.03 |
| Defective allowances | "It's similar to a merchant allowance. Usually those are taken at the end when customers pay. Certain customers take a – you know, like a quarterly percentage of all their revenue, like a 1 percent discount." (Ex. 2 at 588.) | $36,149.20 |
| Trade Discounts | Another form of discount | $164,238.14 |
| MDF Expenses | "[M]arketing deductions taken by retailers. . . . For example, say GameStop put up a SECTION 8 poster in their store, they would charge back whatever that cost them." (Ex. 2 at 593.) | $535,180.11 |
| Warehouse and distribution expenses | "Those are charges sent through to us by our third-party warehouse for order processing."  (Ex. 2 at 593.)  "We don't have our own warehouse to ship product out to retailers." (Ex. 2 at 594.) | $155,589.38 |
| Manufacturing expenses | "That is the manufacturing expenses for all units that were sold to our customers." (Ex. 2 at 590.) | $3,978,883.10 |

These damages had nothing to do with the alleged breach.[12]   Whether or not TimeGate breached the Agreement, SouthPeak would have had to pay for all of these sales-related expenses, as it was solely responsible for marketing and selling the Game under the Agreement. (Exhibit 3 at Art. 8.1(a).)   In fact, these damages had an inverse relationship with the alleged breach.   SouthPeak could have only avoided these expenses if TimeGate failed to meet its contractual obligation to develop Section 8 (which would have left SouthPeak with no product to sell).   And the more successful the Game, the *greater* most of these sales-related expenses would become.

Moreover, these damages were completely dependent upon negotiations and relationships between the SouthPeak Parties and its customers that were beyond TimeGate's control. Therefore, these damages could not have been direct, because they do not result reasonably and naturally from the Agreement.   *See Popcap Games, Inc. v. MumboJumbo, LLC*, No. 05-10-00301-CV, 2011 Tex. App. LEXIS 7122, at *27-31 (Tex. App.—Dallas Aug. 31, 2011, no pet. h.) (characterizing a computer game producer's damages for "sunk costs" that it incurred "outside and apart from its relationship" with the game developer as consequential rather than direct damages).

> ### 2.   All of the milestone payments were consequential damages that were barred by the Agreement.

Second, the milestone payments that the arbitrator deducted from sales revenue could not have been direct damages.   TimeGate could not have possibly foreseen these damages, and they did not necessarily flow from the contract, because the Agreement specifically stated that the milestone payments were "non-refundable."   This is especially true considering that Gamecock

---

[12]   The arbitrator found that TimeGate breached the agreement by failing to make certain investments in the Game, use its best efforts to develop a high quality game, provide certain downloadable content, and give SouthPeak the opportunity to publish a PS3 port and sequel of the Game.  (Exhibit 10 at 14, ¶¶ 22-23.)

and SouthPeak approved each payment and SouthPeak accepted the final "GoldMaster" version of Section 8.  Therefore, if anything, the damages awarded by the arbitrator were consequential rather than direct.

> **D.    The arbitrator's award fails the "essence test."**

Each of these failures to follow the express terms of the contract — stripping TimeGate of intellectual property in the Game and awarding the SouthPeak Parties nonrefundable milestone payments and prohibited consequential damages — constitutes an independent basis for vacatur under 9 U.S.C. § 10(a)(4).  Moreover, when viewed together, it becomes clear that there is "no rational way to explain the remedy handed down by the arbitrator as a logical means of furthering the aims of the contract."  *Executone*, 26 F.3d at 1325.  Because the award is contrary to the Agreement's express contractual provisions in many respects, the award fails the Fifth Circuit's "essence test" and should be vacated in its entirety.

**III.    The arbitrator exceeded his authority by issuing an award without reference to any recognized basis for measuring damages under Texas law.**

Not only does the award fail the "essence test" by changing the express terms of the Agreement, but it violates 9 U.S.C. § 10(a)(4) for one additional reason: the measure of damages awarded by the arbitrator was unmoored to any recognized measure under Texas law.  Although the arbitrator called his award "reliance" damages, no Texas authority recognizes the measure of damages that the arbitrator used.  Where, as here, an arbitrator fails to anchor his award in *any* recognized law, he exceeds his powers.  *Stolt-Neilsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767-70 (2010).

In *Stolt-Nielsen*, the United States Supreme Court vacated an arbitral decision allowing for class arbitration of claims under 9 U.S.C. §10(a)(4), finding that the arbitrators "exceeded their powers" in imposing class arbitration on parties whose arbitration clauses were silent on the

issue of class treatment.  130 S. Ct. at 1767-70.  While courts previously have looked to the underlying contract, the arbitration clause and the submission agreement to determine the scope of the arbitrator's powers and whether those powers have been exceeded, the Supreme Court expanded the reach of Section 10(a)(4).  Even though the parties in *Stolt-Nielsen* had mutually agreed to empower the arbitrators to decide whether class arbitration was available under the parties' agreement, *id.* at 1765, the Court vacated the arbitrators' decision that class arbitration was available – not based on their lack of authority to render the decision, but on their failure to base their analysis on applicable FAA, maritime or New York law.  *Id.* at 1768-70.

Here, the arbitrator failed to base his analysis of the proper amount of damages on any recognized measure under Texas law.  While he characterized the award of $7,348,733.57 as "reliance damages," they were not for several reasons.

*First*, reliance damages – as opposed to benefit of the bargain damages – are meant to restore a party to the status quo at the time before the contract was made.  *Hart v. Moore*, 952 S.W.2d. 90, 97 (Tex. App—Amarillo 1997, pet. denied).  Here, if the arbitrator's award is upheld, the SouthPeak Parties will be in a far *better* position than before the Agreement was made – not only will they recoup the alleged costs and expenses they had incurred *at the time of* arbitration hearing, they will also have perpetual license to Section 8 and will reap all of the profits going forward, without any obligation to pay royalties to TimeGate.

Meanwhile, Section 8 continues to generate substantial revenues for SouthPeak.  In fact, SouthPeak recently requested that TimeGate provide it 50,000 "keys" for customers who are continuing to purchase the Game.[13]  (Exhibit 13.)  Despite these substantial continued sales, TimeGate will receive nothing for its work product.  Such a result improperly allows SouthPeak

---

[13]   Customers who purchase the Game are required to enter a key to unlock the Game.

to "retain all the benefits of the transaction and escape all of the obligations." *Foley v. Parlier*, 68 S.W.3d 870, 885 (Tex. App.—Fort Worth 2002, no pet.).

*Second*, reliance damages are equated to an "out of pocket" measure, which focuses on the differences between the value paid and the value received. *Sobel v. Jenkins*, 477 S.W.2d 863, 868 (Tex. 1972). Here, the "value received" by SouthPeak was not even a part of the calculation. Such an inquiry would require an analysis of the fair market value of Section 8, taking into account the total costs in developing the game, the sales of Section 8 through the time of the arbitration hearing, and expected future streams of payment to SouthPeak from continued sales of the game. However, the SouthPeak Parties offered no testimony and the arbitrator made no findings regarding the fair market value of Section 8.

In the end, the arbitrator simply adopted the SouthPeak Parties' damage claims without any assessment of whether its proffered measure fell within any recognized measure of damages under Texas law. The award should be vacated on account of this failure.

**IV.    By belatedly refusing to consider TimeGate's only evidence showing its monetary contributions to Section 8, the arbitrator failed to give TimeGate an adequate opportunity to present its case.**

Finally, the award should be vacated because, by excluding Exhibit 89, the arbitrator failed to hear material evidence regarding the money that TimeGate spent developing Section 8. Under 9 U.S.C. § 10(a)(3), a court may vacate an arbitration award if "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of the party have been prejudiced." 9 U.S.C. § 10(a)(3). Although an arbitrator is not required to hear all evidence proffered by a party, he "must give each of the parties to the dispute an adequate opportunity to present its evidence and argument." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (quoting *Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985)). The

award should be vacated if the arbitrator's failure to hear material evidence has rendered the proceedings fundamentally unfair.  *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995).

> **A.    The arbitrator led TimeGate to believe that its key exhibit had been admitted and then changed his mind after the hearing.**

TimeGate's Exhibit 89 was essential to proving that it complied with its commitment to invest $2.5 million of its own money under Article 1.12 of the Agreement and, therefore, did not breach the contract.  The exhibit consisted of the affidavit of TimeGate's Chief Financial Officer, and included over 500 pages of backup documentation consisting of itemized expenses that TimeGate was permitted to include as part of its development spending.  (Exhibit 5 (*filed under seal*).)

During the arbitration proceedings, TimeGate reasonably believed that this key exhibit had been admitted.  The SouthPeak Parties did not contest the legitimacy of TimeGate's itemized expenses in Exhibit 89. (Exhibit 2 at 1717-18, 1724-25.)  Rather, they complained about the timing of the production of the exhibit, alleged that an earlier iteration had been produced with different documents and filed a motion for sanctions requesting that Exhibit 89 be stricken from the record.   TimeGate filed a response, and the arbitrator ultimately denied the motion for sanctions.  (Exhibits 6, 14.)

In addition, during the hearing, the arbitrator appeared to reject the SouthPeak Parties' objections to Exhibit 89, stating as follows:

> Okay. I will – I'm going to consider the – your motions, but let me suggest to you that I will entertain a motion later in the hearing as whether or not you need some additional discovery or additional time to complete discovery related to some of these matters. Because as far as I'm concerned I've got two 89s before me and I'm not evaluating one versus the other. So if you want to do something to differentiate them for the record, I welcome you to figure out how you want to approach that. And if you feel that your clients were somehow disadvantaged by the late production, I would consider a motion to allow you time to pursue

additional discovery, whatever that may be, and maybe suspend the hearing at a certain time so that you can conduct that and then reconvene so – I  mentioned that before we started.

(Exhibit 2 at 94.)

Thus, TimeGate continued to rely on the evidence in Exhibit 89 and reasonably believed that it had been admitted.  Additionally, the arbitrator clearly understood that Exhibit 89 was material to its case and defense.  On the final day of the hearing, the arbitrator stated:

It seems to me that Claimant's Exhibit 89 is a critical exhibit for me to consider and it's been challenged because of the allegations that it's been changed. On the other hand, the unfortunate position that I'm in is that it's not my job to go do these analyses of the underlying evidence…

(Exhibit 2 at 1692.)  The "challenge" referenced by the arbitrator in this passage was to the SouthPeak's Motion for Sanctions, which he later denied.

It was not until after the proceedings were closed and all briefing was concluded that the arbitrator suddenly informed the parties that Exhibit 89 would not be admitted.  On September 20, 2011, after the parties had submitted their respective post-hearing briefs, the arbitrator sent the parties an email, which stated:

. . . Before me are Claimant's Exhibits 1 through 108, except for the claims concerning Exhibit 89, and Respondents Exhibits 1 through 146. . . .  It matters not to me if you asked any witnesses any questions regarding these Exhibits, *I admitted them all except 89.*

(Exhibit 7 (emphasis added).)  By that time, it was too late for TimeGate to produce new evidence to show that it met its contractual obligations to fund the Game.

### B. By striking TimeGate's key exhibit after the hearing, the arbitrator prevented TimeGate from presenting material evidence.

In a similar case, the Fifth Circuit has found that vacatur was appropriate under § 10(a)(3).  In *Gulf Coast Indus. Workers Union v. Exxon Co.*, the arbitrator informed Exxon that it did not need to elicit testimony to establish that a document was a business record because the

- 22 -

document was already in evidence.  70 F.3d at 849.  The arbitrator later found that the document was inadmissible hearsay, so the arbitrator reached a final decision that was adverse to Exxon. *Id*.  The Fifth Circuit held that vacatur was proper because the arbitrator "prevented Exxon from presenting additional evidence by misleading it into believing" that its evidence was already admitted.  *Id*. at 850.  "Such misconduct," according to the court, "falls squarely within the scope of Section 10."  *Id*.

As in *Exxon*, the arbitrator in this case changed his position to TimeGate's detriment, well after TimeGate's opportunity to put on additional evidence of its expenditures had passed. Had the arbitrator admitted Exhibit 89—which showed that TimeGate spent more than $3 million of its own money developing Section 8 and $11.5 million total—he could not have found that TimeGate failed to "invest any of its own monies into the development of the Game during the Development Period."  (Exhibit 10 at 5, ¶ 17.)  The SouthPeak Parties' entire damages award turned on the arbitrator's erroneous findings.  (Exhibit 10 at 14, ¶ 23.)  By refusing admission of Exhibit 89, the arbitrator sabotaged TimeGate's ability to present other evidence of its expenditures on Section 8.

Accordingly, the arbitrator's failure to consider Exhibit 89 rendered the proceedings fundamentally unfair, and the arbitrator's finding that TimeGate breached the Agreement should be vacated.

## CONCLUSION AND PRAYER

For the foregoing reasons, TimeGate respectfully requests that the Court:

(1)     deny the SouthPeak Parties' Motion for Entry of Final Judgment Confirming

Arbitration Award;

(2)     grant this Motion, and vacate the arbitrator's award in its entirety; and

(3)     grant all such other and further relief to which TimeGate may be justly entitled.

Respectfully submitted,

/s/ Lynne Liberato
Lynne Liberato
State Bar No. 00000075
Southern District Bar No. 3072
1221 McKinney Street, Suite 2100
Houston, Texas  77010-2007
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
E-mail: lynne.liberato@haynesboone.com

ATTORNEY-IN-CHARGE FOR PLAINTIFF,
TIMEGATE STUDIOS, INC.

OF COUNSEL:

Mark Trachtenberg
State Bar No. 24008169
Southern District Bar No. 24584
Christina Crozier
State Bar No. 24050466
Southern District Bar No. 611402
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 2100
Houston, Texas  77010-2007
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
E-mail: mark.trachtenberg@haynesboone.com

Scott Weiss
Corporate Counsel
State Bar No. 24042134
Southern District Bar No. 38224
14140 Southwest Freeway, Suite 200
Sugar Land, Texas  77478
Telephone: (281) 295-4122
Facsimile: (832) 201-0687
Email: sweiss@timegate.com

COUNSEL FOR PLAINTIFF,
TIMEGATE STUDIOS, INC.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 12th day of December, 2011, a true and correct copy of this motion was served (i) via electronic means through transmission facilities from the Court upon those parties authorized to participate and access the Electronic Filing System for the Southern District of Texas and (ii) via the other methods indicated below.

*Counsel for Defendants:*

N. West Short                                    ***Via e-service and U.S. Mail***
WEST SHORT & ASSOCIATES, P.C.
313 W. 10th Street
Georgetown, Texas  78626


                                        */s/ Mark Trachtenberg*
                                        Mark Trachtenberg

H-917915.14

- 26 -

## <u>INDEX OF EXHIBITS</u>

<u>Exhibit 1</u>      -      October 13, 2010 Press Release

<u>Exhibit 2</u>      -      Transcript of Arbitration Proceedings

<u>Exhibit 3</u>      -      June 15, 2007 Publishing Agreement between TimeGate and Gamecock

<u>Exhibit 4</u>      -      Respondents' First Amended Consolidated Counterclaims

<u>Exhibit 5</u>      -      Claimant's Exhibit 89 (from arbitration proceeding) (*filed under seal*)

<u>Exhibit 6</u>      -      Order Denying Respondents' Motion for Sanctions

<u>Exhibit 7</u>      -      September 20, 2011 e-mail from arbitrator excluding Exhibit 89

<u>Exhibit 8</u>      -      Respondents' September 2, 2011 Post-Hearing Brief

<u>Exhibit 9</u>      -      TimeGate Studios, Inc.'s Post-Hearing Brief

<u>Exhibit 10</u>     -      Final Award, Findings of Fact and Conclusions of Law

<u>Exhibit 11</u>     -      Respondents' Exhibit 143 (from arbitration proceeding)

<u>Exhibit 12</u>     -      Defendants' Proposed Findings of Fact and Conclusions of Law

<u>Exhibit 13</u>     -      November 24, 2011 email re: urgent need for "software keys"

<u>Exhibit 14</u>     -      TimeGate Studios, Inc.'s Response to Respondents' Supplemental Motion for Sanctions

<u>Exhibit 15</u>     -      TimeGate Studios, Inc.'s Response to the Post-Hearing Brief Submitted by Respondents