**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **TIMEGATE STUDIOS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:09-cv-3958** |
| | § | |
| **SOUTHPEAK INTERACTIVE, LLC,** *et* | § | |
| *al.*, | § | |
| | § | |
| **Defendants.** | § | |

---

## MEMORANDUM AND ORDER

---

This case comes before the Court on competing post-arbitration motions. Pending before the Court are Defendants' Motion for Entry of Final Judgment Confirming the Arbitration Award (Doc. Nos. 152, 160, 163), and Plaintiff's Motion to Vacate Arbitration Award (Doc. No. 158). After considering these motions, all responses thereto, and the applicable law, the Court finds that the Motion for Entry of Judgment must be DENIED. The Motion to Vacate must be GRANTED.

### I.       BACKGROUND

This case involves Plaintiff Timegate Studios ("Plaintiff" or "TGS"), a video game developer, and its agreement with Defendant Gone Off Deep, LLC (formerly known as "Gamecock Media Group" or "Gamecock"), a video game publisher. The following facts are undisputed unless otherwise indicated.

The parties' controversy relates to a publishing agreement (the "agreement" or the "contract") between TGS and Gamecock.[1] (Agreement, Doc. No. 158-3.) The agreement governed the marketing and distribution of a computer video game called "Section 8" (the "Game"). Pursuant to the agreement, TGS, as developer of the Game, was to contribute $2.5 million of its own money to the Game, and to retain intellectual property rights in the Game. (Agreement, Arts. 1.12, 9.1(a).) Defendants had a license to "reproduce, manufacture, package, advertise, publish, market, sell . . . and display . . . the Game." (*Id.* Art. 2.1.). The agreement provided that TGS would receive milestone payments, recoup its initial investment, and share in revenue. (*Id.* at Art. 6.2) Defendants were to provide $7.5 million in "Publisher's Development Funding," which was also recoupable, but non-refundable. (*Id.* Art. 1.33.) Article 6.2, governing the distribution of net revenue, provided that, at least once per calendar quarter, TGS was to distribute all net revenue, which was to go first towards reimbursing TGS's and Defendants' development funding. (*Id.* Art. 6.2(a).) Under Article 15 of the Agreement, the parties agreed to limit their respective liability

In October 2008, Gamecock was acquired by Southpeak, which assumed the rights and responsibilities of the "Publisher" under the Agreement. TGS has alleged that Gamecock became insolvent around that time, and has also contended that Gamecock's sublicense agreement with Southpeak violated the agreement between TGS and Gamecock. TGS has further alleged that, in 2009, TGS learned that Southpeak was misreporting sales figures to prevent TGS from receiving the return of its initial investment and its share of the revenue. Defendants dispute these allegations.

---

[1] The Agreement originally was between TGS and Gamecock. Gamecock was later acquired by Defendant Southpeak Interactive, LLC ("Southpeak"). For the purposes of this Memorandum and Order, all Defendants are hereinafter referred to collectively as "Defendants."

Defendants allege that the Game was a flop, resulting in a loss to Defendants of almost $7.5 million. They urge that part of the problem was the quality of the Game; another factor, they urge, was TGS's untimely release of the Game, which forced it to compete with a new version of "Halo," a similar but far more established game. Plaintiffs dispute Defendants' characterizations. Finally, Defendants alleged that TGS failed to contribute $2.5 million of its own money, and did not apply all of Defendants' funding towards development, as it agreed to do.

On the basis of the alleged insolvency and withholding of revenue, TGS terminated the agreement with Defendants. TGS then filed suit, alleging various violations relating to the parties' agreement. (Pl. Compl., Doc. No. 1.) Defendants have maintained that the lawsuit was brought as a means to release TGS from a contract related to an unprofitable game. Defendants have argued that TGS breached the agreement by unilaterally withdrawing from it, by failing to put forth their best effort in developing the Game, and by publishing a sequel to the Game and a "Playstation 3" version of the Game without sharing the revenue with Defendants, as required by the Agreement.

In March, 2010, Defendants moved to compel arbitration on the basis of a binding arbitration agreement in the parties' contract. The agreement states:

> Except for a suit seeking injunctive relief with respect to Confidential Information or infringement of intellectual property rights of a party hereto, any dispute hereunder shall be submitted to binding arbitration pursuant to the rules of the American Arbitration Association (the "AAA"), applying Texas law, without regard to choice of law provisions, with a single arbitrator appointed by AAA. . . . A final arbitral award against either party in any proceeding arising out of or relating to this Agreement shall be conclusive.

(Agreement, Art. 20.3.) In July 2010, based on the above provision, the Court ordered arbitration of "counts and portions of counts asserted by the Plaintiff . . . which do not seek injunctive relief with respect to infringement of intellectual property rights." (Doc. No. 119 at 1.) The Court stayed the remaining claims pending arbitration.

In October 2010, Peter Vogel was selected as the arbitrator and accepted by the parties. In the arbitration, TGS amended its claims for relief, ultimately seeking recovery for breach of contract, quantum meruit, and copyright infringement. TGS also sought attorneys' fees. (Doc. No. 152-B ¶¶ 31-43.) Defendants filed counterclaims seeking relief against TGS for breaching the agreement, for fraud, and for attorneys' fees, and sought declarations that: (1) the Sublicense Agreement between Gamecock and Southpeak was valid; (2) TGS's purported termination of the agreement was invalid; and (3) even if TGS's termination of the agreement were valid, Defendants had the right to continue to market, distribute, and sell the Game for another nine months. (Doc. No. 158-4 ¶ 11.) Defendants also asserted TGS never intended to fully develop the Game, and that it made false, material representations in order to induce Defendants to enter the Agreement. (*Id.* ¶ 10.) On this basis, Defendants urged that TGS had fraudulently induced them into entering the agreement. (*Id.*)

After an 8-day evidentiary hearing, the arbitrator issued his Final Award, Findings of Fact, and Conclusions of Law (the "Arbitration Award" or the "Award") on November 3, 2011. (Doc. No. 158-10.) The arbitrator ruled against TGS on all of its claims and ruled in favor of Defendants on their counterclaims for breach of contract and fraud in the

inducement. Defendants were awarded $7,349,733.57 in reliance damages.[2] (Doc. No. 158-10 at 1, 6.) The arbitrator also found that the administrative fees and expenses of the American Arbitration Association totaled $28,150, and the compensation and expenses of the arbitrator totaled $69,576.22. (*Id.* at 3.) The arbitrator held TGS liable to reimburse the Defendants for its portion of those fees.[3]

## II.   LEGAL STANDARD

The Federal Arbitration Act provides that, "within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. Under the Arbitration Act, four circumstances exist under which an arbitration agreement may be vacated: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced; or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10. TGS's motion to vacate implicates only the fourth of these circumstances.[4]

---

[2] This Award includes $4,223,920 in damages to Gamecock and $3,125,813,57 in damages to Southpeak, plus prejudgment and post-judgment interest, attorneys' fees, and other costs and expenses. (Doc. No. 158-10 at 1, 6.)

[3] In his original award, the arbitrator erroneously decreed that one of the Defendants, Gone Off Deep, was to reimburse another Defendant, Southpeak, for half of the costs. (Doc. No. 158-10 at 3.) This was a typographical error which the arbitrator later corrected to read that TGS is liable to reimburse the Defendants for TGS's portion of those fees. (Doc. No. 163-A.)

[4] TGS's motion initially implicated the third ground for vacatur, as well, as it urged that the arbitrator improperly failed to consider certain key evidence. However, at a hearing before the Court, TGS's counsel

The standard of review of an arbitrator's decision is very narrow. *Burchell v. Marsh*, 58 U.S. 344, 349 (1854) (the appropriate scope of judicial review is whether the award is the honest decision of the arbitrator, made within the scope of the arbitrator's power); *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 510 (2001) (labor arbitration decision could not be overturned even if "serious error" shown). "When an arbitration award is at issue, the district court does not sit as an appellate court or a court of review, to decide the merits of the grievance or the correctness of the award." *Weinberg v. Silber*, 140 F. Supp. 2d 712, 718 (N.D. Tex. 2001), *aff'd*, 57 F. App'x 211 (5th Cir. 2003). Indeed, it is not enough for a party to show that the arbitrator committed an error, or even a serious error. *Stolt-Nielson, S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1768 (2010).

Thus, even if a court disagrees with the arbitrator's interpretation of the underlying contract, the decision may not be vacated so long as it "draws its essence" from the contract. *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1324 (5th Cir. 1994). In determining whether an award meets the Fifth Circuit's "essence test," courts ask "whether the award, however arrived at, is rationally inferable from the contract." *Id.* at 1325. Vacatur is proper if "there is no rational way to explain the remedy handed down by the arbitrator as a logical means of furthering the aims of the contract." *Id.* In making the "essence" inquiry, courts are not limited to the arbitrator's explanation for his award, and do not review the language used by, or the reasoning of, the arbitrator. *Id.* Rather, courts look only to the result reached. *Id.* As long as the arbitrator is even arguably

---

acknowledged that the arbitrator's failure to consider this evidence is not a sufficient basis on which to vacate the order. Counsel admitted that this argument was included in TGS's motion for the purpose of expressing TGS's frustration about the arbitration proceedings. As TGS agrees that this is not a proper basis for vacatur, the Court does not consider this argument.

construing or applying the contract and acting within the scope of his authority, even if the court is convinced he committed serious error, his decision may not be vacated. *United Paperworks Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Ultimately, "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599 (1960). Nonetheless, "'arbitral action contrary to express contractual provisions will not be respected' on judicial review." *Executone*, 26 F.3d 1314, 1325 (quoting *Delta Queen Steamboat Co. v. District 2 Marine Engineers Beneficial Ass'n*, 889 F.2d 599, 604 (5th Cir.1989), *cert. denied,* 498 U.S. 853 (1990)). In deciding whether an arbitrator exceeded his authority, courts must resolve all doubts in favor of arbitration. *Executone*, 26 F.3d at 1325.

## III.    ANALYSIS

TGS contends that the Award in this case ignores fundamental portions of the parties' agreement. Because arbitral action may not be contrary to express contractual provisions, *Executone*, 26 F.3d at 1325, TGS asks that the award be vacated. Defendants respond that the Award is not outside the scope of the contract, but that, even if it is, the arbitrator had the authority to issue such an award. Defendants urge that if the Court finds that portions of the Award *are* contrary to the parties' agreement, the Court must conclude that the arbitrator implicitly voided those inconsistent contractual provisions.

The Court first considers whether, as TGS urges, the award is actually inconsistent with the parties' contract. Concluding that it is, the Court then considers

whether it must read this inconsistency as a tacit voiding of the conflicting portions of the contract, and, if so, whether the arbitrator had the power to so void portions of the contract.

### A.  Whether the Arbitration Award is Contrary to Contractual Provisions

In support of TGS's argument that the arbitrator ignored portions of the parties' Agreement, TGS points to three portions of the Award that it contends conflict with the parties' contract: (1) the perpetual license to the Game; (2) the portion of the damages calculation which factors in $8.29 million in "milestone payments"; and (3) the general measure of damages used by the arbitrator in making the damages calculation.

### 1.  Perpetual License

TGS asserts that the arbitrator's "most egregious departure" from the terms of the Agreement was his award to Defendants of a "perpetual license" to the Game, which also excuses Defendants from paying royalties to TGS. The Award signed by the arbitrator traces Defendants' proposed Final Award, Findings of Fact, and Conclusions of Law, but also includes the following conclusions of law *not* requested by Defendants:

> 15. The Publishing Agreement is hereby amended as a matter of law that Gamecock and [SouthPeak] have a perpetual license for TimeGate's intellectual property in the Game, and Gamecock and [Southpeak] have no obligation to report to TimeGate about sales of the Game that use any of TimeGate's intellectual property, nor do Gamecock and [Southpeak] have any legal obligation to pay any royalties to TimeGate under the publishing Agreement, and Gamecock and [Southpeak] may create Sequels, Ports, Add-Ons related to the Game.

> 16. The Publishing Agreement is hereby amended as a matter of law that TimeGate may create Sequels, Ports, Add-Ons related to the Game or other competing products, and effective the date of this Award the Publishing Agreement is hereby amended that TimeGate has no legal duty to pay any royalties to Gamecock and SIL related to the Game.

> 17. The Publishing Agreement is hereby amended as a matter of law that Gamecock or [Southpeak] may create Sequels, Ports, Add-Ons related to the Game or other competing products, and effective the date of this Award the Publishing Agreement is hereby amended that neither Gamecock nor [Southpeak] has no [sic] legal duty to pay any royalties to TimeGate related to the Game.

(*Compare* Arbitration Award at 12, Doc. No. 158-10, *with* Defendants' Proposed Award, Findings of Fact and Conclusions of Law at 12, Doc. No. 158-12.)

TGS argues that these unrequested conclusions added in by the arbitrator violate the following three provisions of the parties' agreement: (1) Article 20.10, which provides that the agreement "may only be changed by written amendment signed by both parties;" (2) Article 9.1, which states that TGS "shall be the owner of all intellectual property rights in the Game;" and (3) Article 17.1, which limits the duration of the Agreement (and thus limits the duration of Defendants' license to use TGS's intellectual property).[5]

Though Defendants suggest that they disagree with the contention that the perpetual license conflicts with the parties' agreement, they fail to demonstrate how it  its consistent with the contract. They urge that it is in line with the parties' *intent* in entering into the Agreement, but do not indicate why this is so. Rather, Defendants focus on the argument, addressed below, that the arbitrator had the power to void inconsistent contractual provisions in reaching his award. Putting aside the issue of whether the

---

[5] TGS also contends that the perpetual license imposed by the arbitrator violates the well-established principle that arbitration awards must be sufficiently final. *Lummas Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F. Supp. 2d 594, 349 (S.D. Tex. 2002); *see also Alvarado v. Wells Fargo Advisors, LLC*, No. 10-0362, 2011 WL 677354, at *2 (S.D. Tex. Feb. 15, 2011). TGS contends that, because this Award gives both parties the right to develop sequels and other products associated with the Game, the parties will continue to have legal conflicts in the future. Defendants dispute the suggestion that coterminous rights to develop sequels would create ongoing conflict. The Court has insufficient knowledge of this industry to resolve that issue. However, because the Court ultimately concludes that the award violates the essence test and must be vacated, it need not reach address the award's finality.

arbitrator had the power to void contractual provisions, the creation of a perpetual license is clearly contrary to the parties' agreement. It most directly ignores provisions in Articles 9.1 and 17.1. By awarding a perpetual license to Defendants, and providing that they need not pay royalties to TGS, the arbitrator diminished the meaning of the parties' agreement that TGS would be the only owner of intellectual property rights in the Game. Under the Award, Defendants can actually create (rather than simply publish) sequels to the Game. Moreover, by making the license *perpetual*, the Award conflicts with the duration imposed by the parties, which would have limited Defendants' licensing rights. It is beyond question that this portion of the arbitration award is in conflict with at least those two provisions of the parties' contract.

### 2.  Milestone Payments

TGS also argues that the award is inconsistent with the parties' agreement because it factors $8.29 million in milestone payments into the damages calculation, and the agreement provides that such milestone payments are "non-refundable" payments. Pursuant to the contract, Defendants were to pay TGS milestone payments every time TGS hit a certain development marks. The arbitrator's damages award was based on the testimony of Southpeak's accountant, James Huyck, whose model was summarized in Respondents' Exhibit 143. (Doc. No. 158-11.)[6] Huyck took the total of $13,384,296.43 that the Game had generated in sales revenue through June 30, 2011, and subtracted out:

- $8,290,000 in what Huyck called "Royalties", but which Huyck admitted were Defendants' combined milestone payments to TGS, and which constituted "Publishers' Development Funding" under Article 1.33 of the Agreement; and

---

[6] Though apparently based on these figures, the arbitrator awarded exactly $1000 more than what Southpeak requested. TGS assumes this difference is likely the result of a transcription error.

- $12,443,030.03 in various deductions, allowances and expenses – primarily negotiated with third parties.

(Doc. No. 158-2 at 651-55, 671-75; Doc. No. 158-11.) Based on this math, Huyck concluded that Defendants suffered $7,348,733.57 in losses. TGS contends that Southpeak's inclusion of the $8,290,000 in milestone payments in its damages model— the model adopted by the arbitrator—violates Article 1.33 of the agreement.

Article 1.33 states that milestone payments were intended to be a "recoupable, non-refundable amount." TGS asserts that the milestone payments were to be recouped from the revenue received from sales of the Game as set forth under Article 6.2(a) of the Agreement, but that TGS was *not* responsible for refunding milestone payments provided that Defendants accepted all of the milestone submissions TGS provided for the Game. TGS urges that, once Defendants approved the milestone submissions, they could no longer recover the corresponding milestone payments. They certainly cannot recover those payments, TGS argues, after TGS produced a final version of the Game in accordance with the parties' specifications (referred to in the contract as the "Gold Master" version of the Game (Art. 1.20)). (Agreement, Art. 18.2(a).)

Defendants respond that allowing TGS to keep all of these milestone payments would reward TGS's fraud and misconduct. Specifically, Defendants note that while Article 1.33 does state that the milestone payments are non-refundable, it provides that they are "recoupable." Defendants contend that, because of TGS's fraud, Defendants were unable to recoup these costs. Defendants contend that TGS thwarted Defendants' recoupment efforts through its fraud and breaches of the agreement by: (1) publishing the Playstation 3 port without giving Defendants the right of first refusal to do so (Arbitration Award, Findings of Fact ¶¶ 27-31, Doc. No. 158-10); (2) failing to deliver a Russian-

localized version of the Game to Defendants (*id.* ¶ 43); (3) providing corrupt, unusable content to Defendants (*id.* ¶ 45); and (4) refusing to provide access codes necessary for Defendants to distribute the game through certain websites (*id.* ¶ 54). Defendants also contend that Section 18.2(a) of the agreement contemplates Defendants recovering their payments to TGS as a consequence of TGS's material breach. Although 18.2(a) provides for such recovery, if at all, only before the delivery of the Gold Master, Defendants urge that this limitation is invalid in light of TGS's fraudulent inducement. In sum, Defendants urge the Court to reject the proposition that the damages available for a party's fraud in inducing a contract can be limited by the very contract into which that the party was fraudulently induced.

As a matter of contract construction, it is clear that the contract allows for recoupment of milestone payments. However, the contractual language allows, at most, for recoupment of these payments only up until TGS's delivery of the Gold Master. As the arbitrator awarded these payments long after TGS delivered the Gold Master, the Award is inconsistent with the parties' agreement.

### 3. Damages Measure

TGS argues that the arbitrator's award of consequential damages violates the agreement's "Limitation of Liability" provision in Article 15. This provision prohibits the award of consequential damages, or any other indirect damages. It provides:

> IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR ANY LOSS OF PROFIT OR ANY OTHER COMMERCIAL DAMAGE INCLUDING, WITHOUT LIMITATION, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE OR OTHER INDIRECT DAMAGES OF ANY NATURE FOR ANY REASON WHATSOEVER . . . .

(Agreement, Art. 15.)

In addition to the milestone payments discussed above, Huyck also deducted from gross revenue a number of expenses and deductions that were negotiated between Defendants and third parties without TGS's involvement. These expenses and deductions have been summarized by Defendants as follows:

> Jim Huyck, the primary accountant for Respondents, testified that Respondents . . . were liable to vendors for $3,463,331.55 in price protections, $1,055,733.50 in merchandise returns, and $36,149.20 in defective merchandise allowance, had provided $164,238.14 in trade discounts; had incurred $3,978,883.10 in manufacturing and testing expenses; had incurred $2,268,894.99 in marketing expenses, and $535,180.11 in market development expenses; and had incurred $155,589.38 in warehouse and distribution expenses through June 30, 2011.

(Doc. No. 158-8 at 32.) These amounts were awarded by the arbitrator as "reliance damages."

TGS argues that neither the milestone payments nor the other expenses and deductions were a natural or foreseeable consequence of the alleged breach, and that they are therefore consequential damages, barred by Article 15 of the contract. Consequential damages (also called "special damages") repay losses that flow naturally, but not necessarily, from a defendant's breach. *See Arthur Andersen v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). They must be foreseeable and directly traceable to the wrongful act. *Id*.

As to the sales-related damages, TGS asserts that damages arising out of Defendants' relationships with third parties were dependent upon negotiations and relationships between Defendants and their customers, and thus did not flow necessarily from TGS's breach. As to the milestone payments, TGS argues that it could not have

13

possibly foreseen these damages in light of the contractual provision indicating that milestone payments are "non-refundable." The Court has already concluded that the milestone payments are inconsistent with the contract, and need not consider whether they are consequential damages.

TGS contends that any award of direct damages, as required by the contract, would require an analysis of the fair market value of the Game, taking into account the total costs in developing the game, the sales of the Game, and the expected future streams of payment to Southpeak from sales of the Game. Southpeak offered no testimony in support of, and the arbitrator made no findings regarding, the fair market value of the Game.

Ultimately, the Court does not need to determine whether or not the sales-related damages awarded by the arbitrator were consequential damages, precluded by the contract, as the Court ultimately concludes that an award of consequential damages, though it would conflict with the contract, would be within the arbitrator's power.

### B.  Arbitrator's Power to Implicitly Void

Because the Court has concluded that the arbitrator acted contrary to the parties' Agreement in creating a perpetual license and in allowing Defendants to recover their milestone payments, the Court must consider whether he was empowered to do so based upon his finding of fraudulent inducement. In urging that he was, Defendants are asking the Court to find (1) that fraudulent inducement gives an arbitrator the power to void portions of the contract at issue; and (2) that, when an arbitrator acts contrary to certain contractual provisions, he must be seen as having implicitly voided the contrary contractual provisions. The Fifth Circuit has not yet determined whether an arbitrator

may, because of fraudulent inducement, implicitly void portions of a contract, while at the same time finding that the contract remains in effect. However, Defendants contend that case law confirms an arbitrator's power to do so.

### 1. Power to void based on fraudulent inducement

A contract induced by fraud is voidable. *Swain v. Wiley College*, 74 S.W.3d 143, 146 (Tex. App.—Texarkana 2002, no pet.). Outside of the arbitration context, the Fifth Circuit has held that a court may issue a damages award inconsistent with the parties' contract based on a finding of fraud or unconscionability. *See Dunbar Med. Sys. Inc. v. Gammex Inc.,* 216 F.3d 441, 454 (5th Cir. 2000) (district court did not err in awarding punitive damages for a fraudulent inducement claim, notwithstanding a contractual provision in which a party explicitly released its claim for punitive damages). Defendants contend that, because the arbitrator found fraudulent inducement in this case, he had the power to void portions of the contract.

The case most directly on point is *Netknowledge*, 2007 WL 518548 (N.D. Tex. Feb. 20, 2007), *aff'd*, 269 F. App'x 443, 2008 WL 681694 (5th Cir 2008), which holds that an arbitrator may void portions of a contract on the basis of fraudulent inducement. In *Netknowledge*, as here, the arbitrator found that there had been fraudulent inducement. 2007 WL 518548, at *3. In considering the arbitration award, which was contrary to limitation of liability and merger clauses in the parties' contract, the court concluded that the arbitrator "had the authority to interpret the arbitration agreement in such a way as to not give effect to the limitation of liability and merger clauses." *Id.* The court noted that, "[i]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error

does not suffice to overturn his decision." *Id.* (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)) (internal quotation marks omitted).

What distinguishes *Netknowledge* from this case is that, in *Netknowledge*, the parties had briefed the issues of whether the limitation of liability and merger clauses in their contract applied, placing those questions squarely before the arbitrator. 2007 WL 518548, at *3. With the applicability of those two contractual clauses before the arbitrator, it is reasonable to conclude, as the court in *Netknowledge* did, that the arbitration award was inconsistent with those clauses because the arbitrator concluded, as one party had requested, that the clauses did not apply. Here, in contrast, Defendants did not ask the arbitrator to invalidate the relevant portions of the contract on the basis of fraudulent inducement. It is undisputed that the parties did not brief or argue the applicability of the relevant contractual clauses before the arbitrator. Thus, to interpret the award's inconsistency with contractual provisions as an implicit voiding of those contractual provisions would require this Court to go far beyond *Netknowledge*.

Under Texas law, where a contract is the product of fraud, it may be voided "only if the defrauded party proves a right to avoid the contract *and chooses to do so*." *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied) (emphasis added). In this case, Defendants never asked the arbitrator to void the agreement, and instead asked the arbitrator to enforce it. *Cf. Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F.2d 649, 651 (5th Cir. 1979) (arbitrator could not award a remedy that was not submitted to him). Ultimately, Texas and Fifth Circuit case law make clear that, in some circumstances, a finding of fraudulent inducement by an arbitrator can provide a basis on which to void portions of a contract. What is less clear is whether an arbitrator who finds

fraudulent inducement and ignores certain portions of a contract must be assumed to be implicitly voiding those portions. Such an outcome would be especially troubling in cases, such as this, where the applicability of the purportedly voided contractual provisions was not briefed, or even raised, by the parties.

### 2. Power to implicitly void

In urging that arbitrators may void portions of a contract without making clear that they are doing so, Defendants remind the Court that "[a]rbitrators need not give reasons for their awards," and that "[e]ven when arbitrators do not provide a rationale for their awards, courts may not review that reasoning." *Netknowledge*, 2007 WL 518548, at *3 (citing *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 385 (5th Cir. 2004)). In *Executone*, 26 F.3d at 1328, for example, the arbitrator did not explicitly void any contractual provisions when he rendered an award that contradicted release and limitation of liability clauses in the parties' contract. The Fifth Circuit found that the arbitrator "could certainly have rationally concluded" that the release clause did not apply to the dispute, and that the limitation of liability clause should not be strictly interpreted. Thus, *Executone* makes clear that an arbitrator's award is "not contrary to the express terms of the parties' agreement" where the arbitrator rationally could have concluded that the contrary provisions in the parties' agreement do not apply. The arbitrator does not need to be explicit about such a finding, and a Court is to infer it where it is rationally possible. Indeed, in *Netknowledge*, 2007 WL 518548, at *3, while the arbitrator explained why found the merger clause inapplicable, he never discussed the limitation of liability provision, which also conflicted with his award. These cases make clear than an arbitrator can implicitly void portions of a contract without providing his reasons for doing so.

Again, though, a court can determine that an arbitrator was within his power to implicitly void portions of a contract only if such a conclusion is "rationally inferable from the parties' central purpose in drafting the agreement." *Executone*, 26 F.3d at 1328. If it were otherwise, a finding of fraudulent inducement plus implicit voiding would allow courts to avoid the necessary "essence" inquiry.

### C. Whether the Award is Contrary to the Essence of the Parties' Agreement

Thus, the ultimate question in this case is whether, by issuing an award contrary to portions of the party's contract, the arbitrator can be said to have reached a conclusion rationally inferable from the parties' central purpose in drafting the agreement. In considering the arbitrator's chosen damages, portions of which appear to be inconsistent with the contract, the Court recognizes that the deference given to an arbitrator's chosen remedy may be even greater than that applied to his reading of the underlying contract. The Fifth Circuit has held that "the remedy lies beyond the arbitrator's jurisdiction only if 'there is no rational way to explain the remedy handed down by the arbitrator as a logical means of furthering the aims of the contract.'" *Executone*, 26 F.3d at 1325 (quoting *Brotherhood of R.R. Trainmen*, 415 F.2d at 425 (5th Cir. 1969)). Nonetheless, if an arbitrator fails to anchor his award in any recognized law, he exceeds his power. *Stolt-Nielson*, 130 S. Ct. at 1767-70.

The Court concludes that the arbitrator's damages award was an award that the arbitrator rationally could have interpreted as furthering the parties' central purpose. As to the milestone payments, the agreement makes clear the Defendants could recoup these payments only *before* they approved the corresponding milestone submissions, or, at the latest, before TGS submitted the Gold Master version of the Game. By allowing

Defendants to recoup all of their milestone payments so long after a number of approvals of milestone submissions, the award is at odds with the contractual language.

However, the arbitrator rationally could have found that TGS's fraud prevented Defendants from recouping during the time contractually provided for recoupment, and could have concluded that Defendants therefore should be able to recoup that money now. Such a finding, in light of the arbitrator's conclusions regarding fraudulent inducement, serves to further the essence of the parties' contract by allowing Defendants to recoup costs that, but for TGS's fraudulent inducement, they would have been able to recoup during the time provided by the contract. Because the arbitrator could have, without violating the essence of the contract, found that the provision limiting the time for recoupment did not apply in light of TGS's fraudulent inducement, the award of milestone payments does not provide a basis on which to invalidate the award.

As to the sales-related damages, TGS urges that the arbitrator exceeded his powers by awarding consequential damages in violation of the Agreement. TGS cites to *Int'l Talent Group, Inc. v. Copyright Mgmt., Inc.*, 769 S.W.2d 217, 219-20 (Tenn. Ct. App. 1988) (where parties to software agreement agreed to clause limiting liability for "incidental, special or consequential" damages and capped the licensor's liability at $7500, the arbitrators' award of $76,400 was properly vacated under the "exceed their powers" prong), and *Peacock v. Wave Tec Pools, Inc.*, 107 S.W.3d 631, 638-39 (Tex. App.—Waco 2003, no pet.) (arbitrator exceeded his authority by ordering a remedy outside the specific remedies contemplated in the arbitration agreement), for the proposition that arbitrators who award damages specifically precluded by the contract

exceed their powers. These cases are distinguishable, however, because they did not involve a finding of fraud.

The Texas Supreme Court has held that "consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable. It is possible that . . . consequential damages could include the foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation." *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 49 n.1 (Tex. 1998) (internal citation omitted). Though *Formosa* did not involve a contractual clause limiting consequential damages, it nonetheless supports the position that consequential damages might be especially appropriate in cases of fraudulent inducement.

Although the damages awarded by the arbitrator in this case might be properly classified as consequential damages (the Court has not made a determination on that issue), the Court is not convinced that an award of consequential damages that is at odds with express contractual language is outside of the arbitrator's authority in cases where fraudulent inducement is found. In this case, it is reasonable to infer that the arbitrator awarded consequential damages based on a finding that the parties' contract, entered into because of TGS's fraudulent inducement, could not limit the damages available to Defendants. Because there is a rational way to explain this remedy as a logical means of furthering the aims of the contract, the Court cannot vacate it.

The arbitrator's creation of a perpetual license is another matter. The Court cannot conceive of a way in which a perpetual license, which violates at least two provisions of the parties' contract, and is inconsistent with the fundamental purpose of the contract, is

rationally inferable from the contract itself. The provision takes what was a temporary licensing agreement, which required collaboration and coordination between the parties, and expands it into a permanent contract under which the parties are able to develop competing products. The contract is turned on its head by expanding the rights of Defendants to allow them to actually create sequels, ports, and add-ons related to the Game, without any obligation to pay the Game's developer, TGS, royalties. Ultimately, the Award gives Defendants rights far beyond what even they requested, and awards those rights in perpetuity. *See Totem Marine*, 607 F.2d at 651 ("[A]rbitrators are restricted to those issues submitted.").

For courts, a standard of review that requires ascertaining the "essence" of a writing is very close to no standard at all. Particularly so when the authorship of the writing took place years earlier in circumstances the parties dispute. In trying, however, to give some substance and context to a contract's essence, surely there would be a high degree of consensus among courts that certain variables do bear on the inquiry. For example, courts would agree that the essence of a contract is threatened when major parts of a contract are voided, especially when no party has requested voiding. Likewise, there would be agreement that changing from one party to the other the ownership of the property that is the subject of the contract—again, without the request of any party—would vitiate the contract's essence.

Many other considerations would, in appropriate cases, help develop the profile of a contract's essence. But, the considerations that the Court has relied on in this case are ones that it believes strongly militate in favor of a finding that the arbitrator—whose good faith is not questioned—did countermand the contract's essence.

IV.     CONCLUSION

The Fifth Circuit has explained that, where an arbitrator exceeds his contractual authority, vacatur or modification of the award is an appropriate remedy. *Delta Queen Steamboat Co. v. Dist. 2 Marine Engineers Beneficial Ass'n, AFL-CIO*, 889 F.2d 599, 602 (5th Cir. 1989). The Court concludes that it cannot modify the award while still preserving its intent, and acting consistently with the essence of the parties' contract. The award therefore must be **VACATED**.

**IT IS SO ORDERED.**

Signed this the 20th day of March, 2012.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE